John M. Carter and John H. Morrow, Trustees, and Charles Shipley *vs.* Joseph B. Woolfork, and others.

*Tax sales — Possession under Color of Title — Unlawful entry — Ejectment — When proper Remedy.*

W. died in 1847, seised and possessed in fee of a lot, unimproved, and vacant, in Baltimore City. In October, 1862, M. bought this lot at a tax sale, and received a deed therefor in November, 1863, from the Collector. He paid the taxes for that year and each successive year up to and including 1868. In September, 1868, he leased the lot to S. for ninety-nine years renewable forever. S. paid the taxes on the property until 1875, when it was sold for the non-payment of taxes for that year, and was purchased in behalf of S. and the sale was finally ratified by the Circuit Court of Baltimore City. S. paid taxes for every subsequent year until 1888. He also paid an assessment on the property for a paving tax, and the rent falling due under the lease up to September, 1886. He paved the sidewalk in front of the lot. He also put up a sign on the premises, offering the lot for sale or lease. In 1887, parties claiming to have derived title in fee under the will of W. to said lot, caused a fence to be built in the front and rear of the lot, connecting at one end with a brick house and at the other with a fence, and permitted a licensee to use it free of charge. Subsequently in the same year, they filed a bill to have the tax sales set aside and cancelled, and S. and the trustees under the will of M. enjoined from setting up any claim to the land under said sales, or either of them. Held:

That the possession of S. under color of title, was not defeated by the entry in behalf of the complainants, and their occupation of the premises was not lawful. Equity would not interpose in their behalf; they must establish their title by an action of ejectment.

Appeal from the Circuit Court of Baltimore City.

A lot of ground in the City of Baltimore was sold for taxes in October, 1862, to John Morrow, now deceased.

The lot was and always has been unimproved and vacant. Morrow paid the State and City taxes accruing after his purchase up to and inclusive of the year 1868. In September, 1868, he, in consideration of one hundred dollars, leased this lot to Charles Shipley for ninety-nine years, renewable forever, at the annual rent of fifty-four dollars. Shipley paid the taxes on the property until 1875. In that year it was sold for taxes, and purchased for Shipley at his request. He paid taxes for every subsequent year until 1888. He also paid an assessment made on the property for a paving tax, and he paid the rent falling due under the lease up to September, 1886. A sign was put up on the lot with these words: "For sale or rent, apply to Charles Shipley, No. 5 Courtland St.," which was always kept there, except when knocked down by boys or other persons, and then it was renewed. Sometime, not accurately shown, but before May 30th, 1887, the attorney of Joseph B. Woolfork and others, caused a fence to be built in the front and rear of this lot, connecting at one end with a brick house, and at the other with a fence, which was the boundary line of an adjoining lot; and permitted one Shafer to use it free of charge. On the thirtieth of May, 1887, one of their attorneys wrote a letter to Shipley, and stated that it would be necessary to enforce by legal proceedings any title which he supposed he had to this lot.

A bill in equity was filed by Joseph B. Woolfork and others, stating that in the year 1847, Austin Woolfork died seised and possessed in fee of the lot in question, and that they derived title in fee under his last will and testament; that they were non-residents of the State; that the tax sales were illegal and void; that John M. Carter and John M. Morrow, trustees under the will of John Morrow, deceased, and Charles Shipley unjustly set up title under said sales, and thereby caused a cloud on the title of complainants, and rendered it unmer-

chantable.    The prayer was that the tax sales might be set aside and cancelled, and that Carter and Morrow, trustees, and Shipley might be enjoined from setting up any claim to the land under the sales or either of them, and for general relief.    A good deal of testimony was taken.    It was admitted that all of the complainants are, and always have been non-residents of the State. At the hearing the Court, (DENNIS, J.,) passed a decree cancelling the two tax sales, and enjoining the defendants from setting up any claim to the land under them. The defendants appealed.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, BRYAN, and McSHERRY, J.

*Thomas G. Hayes,* and *John M. Carter,* for the appellants.

\*Roger T. Gill, and *William A. Hammond,* for the appellees.

BRYAN, J., after stating the case as above reported, delivered the opinion of the Court.

The lot in question was sold for taxes, and purchased by John Morrow in the month of October, eighteen hundred and sixty-two.    The deed was executed by the Collector in November, eighteen hundred and sixty-three. He paid taxes for that year and for each successive year up to and including eighteen hundred and sixty-eight. In September, eighteen hundred and sixty-eight, he leased the lot for ninety-nine years, renewable forever, to Charles Shipley, at an annual rent of fifty-four dollars, payable semi-annually.    Shipley paid this rent up to September, eighteen hundred and eighty-six, and paid all the taxes on the lot from eighteen hundred and sixty-

*Present, but did not participate in the argument.

nine to eighteen hundred and eighty-seven, (both in-
cluded,) with the exception of those accruing for the
year eighteen hundred and seventy-five. The lot was
sold for the non-payment of these last mentioned taxes,
and purchased in behalf of Shipley; and the sale was
finally ratified and confirmed by the Circuit Court of
Baltimore City. Shipley also paid an assessment for
paving an alley in the rear of the lot; and paved the
side walk in front of the lot; and has kept the pave-
ment clear of snow during the winter, and the gutters
clear of grass during the summer, ever since he obtained
his lease. He also put up a sign on the premises offer-
ing the lot for sale or lease, which has been always
kept there, except when knocked down by disorderly
persons.

We will assume that the tax proceedings under which
Morrow purchased were irregular, and not efficient to
maintain his title. Yet the deed was valid on its face,
and was made by a public officer who had the right to
sell the property for the unpaid taxes; provided he com-
plied with the requirements of the law. It could under
no circumstances be considered as conveying less than
color of title. In *Wright vs. Mattison,* 18 *Howard,* 56, the
Supreme Court said: "The Courts have concurred, it
is believed without an exception, in defining 'color of
title' to be that which in appearance is title, but which
in reality is no title. They have equally concurred in
attaching no exclusive or peculiar character or importance
to the ground of the invalidity of an apparent or colora-
ble title; the inquiry with them has been whether there
was an apparent or colorable title, under which an entry
or a claim has been made in good faith." To the same
purport, is *Baker vs. Swan's Lessee,* 32 *Md.,* 358. The
effect of an entry by one under color of title is very differ-
ent from the entry of a mere *tort feasor.* Before the Act
of 1852, a person holding merely by adverse possession,

without written title, had possession only to the limits of his actual enclosure; while he who entered under color of title had actual possession to the extent of the boundaries set forth in his deed, although the title conveyed by it might be good for nothing. *Haye vs. Swan's Lessee,* 5 *Md.,* 248. The efficacy of color of title in this respect was as great as that of a deed conveying a valid and indefeasible title. Now Morrow having an apparent, though imperfect, right of possession pays the taxes on this lot. Of course the payment of taxes is not equivalent to an entry on land, and cannot *ipso facto* confer any title on the person who pays them. But when the payment is made by one who has a right of possession, it is a declaration that he is claiming the exercise of his right, because it is a discharge of the burdens which legally rest upon such right. It is a claim of ownership quite as distinct as a corporal entry on the vacant and unoccupied lot. The actual *pedis possessio* of the lot is not necessary to give him the benefit of his title such as it is. But the subsequent action of Morrow could leave no doubt that the payment of taxes was made in consequence of ownership claimed and exerted over the property. He leases the lot for ninety-nine years, and he and his representatives receive rent for it up to a short time previous to the institution of this suit. The tenant pays the rent and does the other acts above mentioned, which are clearly acts of ownership in connection with payment of rents. The seisin and possession of the land is supposed to be in Morrow, the lessor, while the lessee is supposed to be possessed, not of the land but of the term of years. 2 *Blackstone's Commentaries,* 144. The possession of the lessee is the possession of the lessor or reversioner. We consequently see that Morrow and his representatives have been in possession of this lot from the date of his deed in November, eighteen hundred and sixty-three, until the present time; unless their possession was

ousted by the entry made in behalf of the complainants in 1887. But we must not overlook the second sale for taxes made in eighteen hundred and seventy-seven. This sale was finally ratified and confirmed by the Circuit Court of Baltimore City. The ratification established a *prima facie* title in the purchaser which could not be overthrown, except by proof that the proceedings of the collector were irregular. *Guisebert vs. Etchison,* 51 *Md.,* 488.

It is maintained that the entry in behalf of the complainants defeated the possession under both of these tax sales. We suppose that we are to take it as conceded that Austin Woolfork died in the year 1847, seised and possessed of this lot of ground in fee, and that the complainants acquired title in fee under his will. Although they never made any entry on the land, yet, it is well settled in this State and in most of the States, that the title of an owner of real estate always draws to itself the possession of vacant property. This possession has sometimes been called constructive; but it is in no wise different in its legal effect from an actual visible occupation. *Cresap vs. Hutson,* 9 *Gill,* 269; *Hoye vs. Swan's Lessee,* 5 *Md.,* 237. The possession of Woolfork's devisees would therefore continue until it was displaced by an adverse holding of some kind. As long as they held the legal title, they would retain their right of entry, unless it was taken away by the Statute 21 James the First. And they might by the use of reasonable force expel any person wrongfully holding the possession. *Manning vs. Brown,* 47 *Md.,* 512. It is said that by the ancient common law, the disseisee was not only allowed but required to expel the wrong-doer *incontinenter, flagrante disseisina et maleficio;* but that if he did not eject him within a reasonable time, he was put to his assise of novel disseisin. *Bracton,* 166. And at the present day, although under the Statute 8 Henry 6,

chapter 9, where there is a wrongful but peaceable entry and a forcible detainer, the possession may be restored to the rightful owner by proceedings before a justice of the peace; yet by a clause of the same statute, this cannot be done where the wrong-doer has had three years peaceable enjoyment of the property. And this exception is enforced by 31 Elizabeth, chapter 11. It would seem to follow that the rightful owner can not by his own act expel a wrong-doer, who has had three years peaceful possession, holding adversely. We do not, however, care to pursue this inquiry, because this question has other aspects which we prefer to consider. Under a deed valid on its face Morrow and his representatives held undisturbed possession for twenty-four years; counting, of course, the possession of the lessee, as that of the reversioner. Their title therefore is perfect under the Statute of James ; except as against such persons as are within the disabilities therein mentioned. Parties seeking to overthrow a title *prima facie* good, must maintain their pretensions by proof; and as a consequence the party in possession has a right to defend himself by countervailing proof. And this contest is not to be decided by the act of one of the parties, but by the tribunals appointed by law for the decision of such controversies. The same remark will apply to the title under the second tax sale, which, as has been already said, is *prima facie* good, and it will make no difference if it is really invalid; as we will assume it to be. If I leave my house vacant for a few days, and on my return find that a stranger is occupying it against my will, my possession is not ousted. The intruder is merely a trespasser, and I may eject him with strong hand. And the same may be said of any other wrongful invasion of my possession, unless I have lost my right of summary ejection by lapse of time. But the distinction is palpable, between such cases and those where

Carter and Morrow, Trustees, *et al. vs.* Woolfork, *et al.*

possession is held under a *prima facie* title.    In *Hoye vs. Swan's Lessee,* 5 *Md.,* 248, the Court speak of "the obvious and important distinction, which the reported cases and elementary writers recognize between a possession taken by a wrong-doer, and one taken by a person under title."   And it is said : "It appears to be immaterial whether the title be valid or not, provided the entry and claim be *bona fide* under that title."    *Blackstone* mentions the difference between an *apparent* right of possession which may be defeated by proving a better and an *actual* right of possession, which will stand the test against all opponents.    *2nd Book, p.* 196.    He also shows that the extra-judicial and summary remedy of the legal owner to obtain restitution of his land by entry is confined to cases where a wrong-doer has only a *bare* or *naked possession;* and that where an *apparent right of possession* exists the law will not suffer that right to be overthrown by the mere act or entry of the claimants. *3rd Book,* 175 *and* 177 *pp.*    There is always a right of entry in every case where an ejectment will lie; but it is a very different proposition when it is asserted that an entry under this right will defeat a possession held under color of title.    The occasion does not require us to discuss more fully the nature and limitations of this right. It will sufficiently appear from what has been said, that in our opinion the entry in behalf of the complainants did not defeat the previous possession, and that their occupation of the premises is not lawful.

We have considered the case as if the complainants were within the provisos of the Statute of 21 James the First.   But the record informs us that one of the devisees under Woolfork's will died during the late war, and one in the year eighteen hundred and seventy-one. The question arises as to the effect of these deaths on the operation of the statute.   The second section saves the rights of entry and action to all persons who, at the

time when their title first accrued, were within the age of one and twenty years, *fémes covert, non compotes mentis,* imprisoned or beyond the seas; provided, however, that such person, or persons, or his, her, or their heir, or heirs, should within ten years next after his or their full age, discoverture, coming of sound mind, enlargement out of prison, or coming into this realm, or death, take benefit of, and sue forth the same, (the writs mentioned in the statute,) and at no time after the said ten years. We have quoted the identical words of the statute. The obvious meaning seems to be that the persons under the disabilities mentioned are not barred by twenty years, provided they make entries or bring actions within ten years after the removal of the disabilities, and their heirs are not barred, provided they proceed within ten years after the death of the ancestor. And this is believed to be the settled construction. In *Doe vs. Jesson,* 6 *East, m. p.* 84, Lord ELLENBOROUGH said: "The word *death* in that clause must mean and refer to *the death of the person to whom the right first accrued,* and whose heir the claimant is; and the statute meant that *the heir* of every person, to which person a right of entry had accrued during any of the disabilities there stated, should have ten years from the *death of his ancestor,* to whom the right first accrued during the period of disability, and who died under such a disability, (notwithstanding the twenty years from the first accruing of the title to the ancestor should have before expired.)" And Mr. *Preston* in the second volume of *Abstracts of Title* says: "Although the ancestor may die under a disability, it is now settled contrary to the opinion of former times, that the heir, &c., must make his claim within the period of five years; and it seems to be the sound and now established true construction of the statute of non-claim on fines, that no one, except the person to whom the right *first* accrues is within the protection

afforded by the saving clause in the statute of non-claim; and consequently, if A. having a present right of entry or of action, dies while laboring under a disability, his heir, though laboring under a disability, must enter or claim within five years, or he will be barred by non-claim on the fine." P. 341. The author was referring to the Statute of 4 Henry VII, which allows five years within which to avoid a fine levied with proclamations, and makes the usual saving in favor of persons under disability; but the same principle of construction must apply to the Statute of James. And indeed it is well established that the disability is protected, which exists at the time when the right of action first accrues; but the operation of limitations can not be prevented by cumulative or successive disabilities. *Dugan vs. Gittings,* 3 *Gill,* 138. Some cases such as *Cotterell vs. Dutton,* 4 *Taunton,* 826, and others, are in conflict with the views which we have expressed, but we deem them to be overthrown by the weight of reason and authority. We think that where a disability exists at the time when a right of entry on land accrues, and the person entitled dies during the disability, the heir has ten years to make his entry; and that he is not barred then unless twenty years have elapsed since the right of entry first accrued. In other words he is entitled to twenty years from the origin of the title, and ten years from the death of the ancestor; but that these limitations run concurrently and not successively. We also think that no disability of the heir can protract these periods, or postpone the running of limitations.

As the entry has not defeated the possession under the tax sales, the complainants must establish their title by an action of ejectment, which is the legitimate mode of deciding possessory titles. The bill in this case was intended to remove an alleged cloud on the title to real estate, and is in the nature of a *quia timet.* It must fail

on the principle stated in *Polk vs. Pendleton*, 31 *Md.*, 124. "Those only who have a clear legal and equitable title to land, connected with possession, have any right to claim the interference of a Court of equity, to give them peace or dissipate a cloud on the title."

It must be stated that the majority of the Court do not consider it necessary to decide the question of limitations, inasmuch as they hold that for the other reasons stated in this opinion, the decree of the Court below ought to be reversed.

*Decree reversed, and*
*bill dismissed with costs.*

(Decided 13th June, 1889.)