## FRANK BAUMEISTER vs. HOWARD C. SILVER.

*How Sale of Real Estate Directed by Will to be Sold May be Made— Testator's Heirs Entitled to Possession—Statute of Limitations— Disability of Infancy—Construction of Act of 1894, ch. 661, taking From Non-Residents Their Exemption From Operation of Statute of Limitations—Specific Performance—Marketable Title.*

When a testator directs that his real estate shall be sold and the proceeds disposed of in a certain manner, but does not provide how the sale shall be made and appoints no executor, then a sale can be made only under a decree of a Court of equity, and the legal title to the property is meanwhile in the heirs at law of the testator liable to be divested by a sale.

In such case the Statute of Limitations begins to run against the heirs from the time their title accrued.

When a person entitled to land held adversely by another dies before the adverse possession has lasted for twenty years leaving an infant heir, such death does not stop the running of the Statute of Limitations, but the heir has ten years after the removal of the disability of infancy in which to make entry.

Under the construction placed upon the Statute of 21 James I., ch. 16, a non-resident of this State entitled to land in this State was not barred

by any adverse possession of the land, unless he failed to institute an action to recover it within ten years after coming into the State. The Act of 1894, ch. 661, provided that the period within which any action may be brought under the Statute of Limitations shall not be extended because the plaintiff was or is beyond seas or out of the jurisdiction of the State at the time of the accrual of the right of action. *Held*, that where a non-resident at the time of the passage of the Act had a vested right to sue to recover land held adversely for more than twenty years, the Legislature could not take away the right without allowing a reasonable time within which to institute the action and the Act of 1894 should be construed so as to allow a non-resident ten years after its passage within which to bring his action.

The owner of a parcel of land died in 1858, leaving surviving him a widow, a son, a grandson (the issue of a deceased son), and two children of a deceased daughter. The owner's will directed that the property should be sold, that his widow should be entitled to a life interest in the proceeds of sale, and after her death there was an invalid bequest of the money. The will appointed no executor and gave no directions as to how the sale should be made. The widow was appointed administratrix and in the same year, 1858, she conveyed the property to one M. who held exclusive and adverse possession of it till his death in 1892. It was conceded that this deed by the administratrix did not pass title. The plaintiff in this case purchased the property in 1892 from the trustee of M's. estate and has since been in possession. In 1903 the defendant agreed to buy it, but upon his objection that the title was not good and marketable the plaintiff filed the bill in this case for specific performance. The testator's son died in 1867. The two children of testator's daughter left the State before the testator's death when they were infants. The evidence did not show that they had ever since returned to the State or whether they are living or whether if dead they left issue. *Held*.

1st. That upon the death of the testator his widow was not entitled to a life estate in the property, but the right of entry then vested in the heirs at law of the testator and the Statute of Limitations began to run against them from the time the purchaser M. went into possession in 1858, and that his adverse possession and that of the plaintiff is a bar to any claim of the issue of testator's son and that of the testator's other grandson who had not been heard of since the civil war.

2nd. That the children of testator's daughter having been non-residents at the time their right of action accrued, they, or their issue if they are dead, are not barred by limitations, and since when the bill was filed ten years had not elapsed since the passage of the Act of 1894, ch. 661, taking away from non-residents their exemption from the Statute of Limitations, there is such a reasonable doubt as to the existence of their claim to the land that specific performance of the contract of purchase should not be enforced.

Appeal from the Circuit Court of Baltimore City.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, SCHMUCKER and JONES, JJ.

*Harry M. Nitzel,* for the appellant.

*Randolph Barton, Jr.,* for the appellee.

BOYD, J., delivered the opinion of the Court.

The appellee filed a bill in equity to require the appellant to specifically perform a contract made by them, whereby the latter agreed to purchase a house and lot on Fayette street in the city of Baltimore.   The appellee agreed to convey a good and marketable title in fee-simple and the Court below having determined that his title was such as the contract provided for, and having passed a decree to that effect, this appeal was taken.   The property belonged to one Samuel Hiner, who died in 1858.   He left a will, but did not appoint an executor or name any one to sell his property.   The widow was appointed administratrix with the will annexed, and on the 13th of December, 1858, she executed a deed for the property in question to Alexander McComas, which recites that by virtue and in pursuance of the power and authority vested in her by the last will and testament of Samuel Hiner she offered the property at public auction and sold the same to Alexander McComas.   The deed acknowledges the receipt of the purchase-money and undertook to convey all the estate, interest, etc., of Samuel Hiner, and of the said Sarah Jane.   The sale was not reported to or ratified by the Orphans' Court, and it is conceded that the deed did not pass the title, beyond such interest as the widow had in the property.   But Mr. McComas took possession of the property and held the "uninterrupted, adverse, exclusive" possession of it from the date of the deed to the time of his death, which was March 12th, 1892.   After his death a creditor's bill was filed to sell this and other real estate owned or claimed by

him, and this property was purchased by the appellee from
the trustees appointed under that proceeding, and he has been
in possession of it from the date of his deed, May 27th, 1893,
to the present time.    In this last-mentioned proceeding some
steps were taken with a view of curing the defect in the title
which we will hereafter refer to.

Samuel Hiner was married twice.    He had no children by
his second wife, but had two sons and a daughter by his first
wife.    When he died, his son, George N., was living, but the
other son and daughter were dead. The deceased son, Henry,
left a son, and the daughter, Elizabeth Mitchell, left two sons,
Joseph and Samuel—the heirs living at the time of the death
of Samuel Hiner being the son George and the three grand-
children above mentioned.    The record does not show when
the widow died, and therefore the appellant contends that it
is not known when the right of entry of the Hiner heirs
accrued, and that hence it cannot be determined whether they
are barred by the adverse possession of Alexander McComas
and those claiming under him.    His contention is thus stated
in his brief: "The right of entry did not accrue until the death
of Sarah J. Hiner, as she had a life interest in the proceeds of
the sale of the property, and constructively in the property
itself until sold, subject to a charge of two hundred dollars
upon the property in favor George Hiner."    But is that
correct?    The will does not leave the property to the
widow for life.    It simply says: "After my death I desire
that all the property of every description, real, personal
and mixed, shall be sold (I mean all the property that
may belong to me) and the proceeds divided as fol-
lows: *First*, my son, George N. Hiner, to receive the
sum of two hundred dollars from the proceeds thereof.
It is my desire that the property mentioned aforesaid shall be
sold, and the proceeds thereof be placed on interest for the
benefit and support of my wife, Sarah Jane Hiner, during her
natural life, after deducting therefrom the two hundred dol-
lars devised to my son, George, and after her death the
amount left shall be divided between the two Sunday Schools

of Sharp Street and Asbury Station of the Colored People's Methodist Churches." It will be observed that the testator does not attempt to give his wife a life-estate in this or any other property he owned, but he directed that all of his property be sold, and then after paying his son the two hundred dollars (and while he does say so in that connection, of course, all of his debts, if any, and funeral charges had to be paid), the balance of the proceeds was to "be placed on interest for the benefit and support" of his wife, during her natural life. It cannot be said, therefore, that he devised the property to her for life, and at most she only had an equitable interest in it. Independent of any question of estoppel by reason of the deed made by her, Mrs. Hiner could not have maintained an action of ejectment to recover the property, for it is well settled that the plaintiff must have a legal title and the right of possession of the premises sued for. Who then could bring such an action to recover this property? As we have seen, the testator appointed no one to make the sale and did not even name an executor, and it is conceded that the bequest to the two Sunday Schools is void. The legal title to the property therefore vested at once in the heirs at law, subject to being divested by a sale if properly authorized. In *Magruder* v. *Peter*, 4 G. & J. 329, the Court referred to *Sugden on Powers*, 167, which states that "where a testator directs his estate to be sold, without declaring by whom the sale shall be made, if the fund be distributable by the executor, either for the payment of debts or legacies, he will take a power of sale by implication," and the Court went on to say that "In Maryland a different course has been generally pursued, founded perhaps on an Act of the Assembly, passed in 1785, ch. 72." That Act authorized the Chancellor to appoint trustees in such cases to sell the property and apply the proceeds to the purposes intended, and is still in force in this State, now being sec. 79 of Art. 16 of the Code. But as there was no executor named in this will, there was no power of sale by implication, such as spoken of by Mr. Sugden, and the only way a sale could have been legally authorized was by application to

a Court of equity.   In *Magruder* v. *Peter,* the Court further said that the legal estate, mentioned in a clause of the will in which the testator expressed a desire that a certain tract of land be sold and the proceeds, together with his personal property, be applied to the payment of his debts, "vested in the children of David Peter, *as his heirs at law,* liable to be divested upon a legal sale," a compliance with the terms of sale and payment of the purchase-money.    Their right to sue in ejectment was expressly maintained.   In *Seeger* v. *Leakin,* 76 Md, 500, the testatrix left a number of legacies amounting to thirty thousand dollars, and gave her executors power to sell her estate, real and personal, not specifically devised or bequeathed.   The Court said "the real estate is not devised to or vested in the executors, by any provision in the will; and in such case the executors have only a naked authority to sell; and in the meantime the freehold descends to the heirs at law, who are entitled to the profits thereof until sale made." In *Rizer* v. *Perry,* 58 Md. 112, the testatrix devised a house and lot to her niece for life, directed her executors to sell them after the death of the niece, and undertook to leave the proceeds for purposes which were declared to be void.   This Court adopted the opinion of JUDGE ALVEY, who decided the case below, and he held that the power to sell conferred upon the executors and the bequests of the proceeds of sale were clearly void, "and being void, the real estate, the subject of the power, descended to, and became vested in the heirs of the deceased, at the time of her death, unless it be embraced by the residuary clause of the will."    Later in the opinion he held that it was not so embraced, but went to the heirs at law.

In this case the legacy to the son and the provision for the wife were valid, and therefore there could have been a sale of the property, but inasmuch as the real estate was not devised to any one, the only way it could be sold was by application to a Court of equity, and the legal estate vested in the heirs at law from the death of the testator.   Whether the widow could have demanded of the heirs the rents and profits until a sale was made is not material, but it is perfectly clear that she

did not have a life estate in the property itself, and when Mr. McComas took possession the heirs could have maintained an action of ejectment against him and were entitled to collect the rents and profits.   We do not question the authorities cited by the appellant to show that inasmuch as a remainder-man cannot institute an action of ejectment until the termination of the life estate, when there is one, therefore the Statute of Limitations does not begin to run against them until that time.   *Preston* v. *Evans*, 56 Md. 476; *Long* v. *Long*, 62 Md. 33, and other cases in this State are sufficient to sustain that doctrine, without relying on decisions elsewhere.   But we are of the opinion that under this will the widow did not have such an interest in the property as to prevent the heirs at law from maintaining an action of ejectment against Mr. Mc-Comas, and so long as the property remained unsold by authority of the Court, they were entitled to, and could have recovered the property.   The running of the Statute of Limitatations against them was therefore not prevented by reason of the widow being still alive, even if it be conceded that she lived for many years after the death of her husband.

. 2. Having disposed of that question, we will now consider the rights, if any, of the heirs at law in this property.   There would seem to be no question about the one-third interest of the son George.   He lived in Baltimore and died in 1867. As McComas entered in 1858 the right of George was not barred at the time of his death, but his death did not stop the running of the statute, which had commenced to run in his life-time.   In the case of *Carter* v. *Woolfork*, 71 Md. 283, the second section of 21 James the First, ch. 16, is considered and the conclusion is thus stated with reference to the right of an heir of one who dies under disability:   "We think that where a disability exists at the time when a right of entry on land accrues, and the person entitled dies during the disability, the heir has ten years to make his entry; and that he is not barred then unless twenty years have elapsed since the right of entry first accrued.   In other words he is entitled to twenty years from the origin of the title, and ten years from

the death of the ancestor ; but that these limitations run concurrently and not successively.    We also think that no disability of the heir can protract these periods, or postpone the running of limitations."    In the leading case of *Dugan* v. *Gittings*, 3 Gill, 138, it was said "The rule is this : a party is protected by the disability that exists at the time his right of action first accrued, because the case is within the express terms of the saving clause in the statute.    For the same reason, if there are in existence several disabilities, at the time the right of action accrues, the statute does not begin to run until the party has survived them all.    But it is now firmly established, that you cannot prevent the operation of the statute by cumulative disabilities.    *    *    *    If subsequent disabilities were to be regarded, the right of action might be saved for centuries ; and the statute would be rendered incapable of accomplishing the important purposes for which it was passed." The record does not show that George was under age when he died, and he probably was not as he was married, but if he was and if he left heirs, or an heir, under disabilities, the right of entry as to his third was under the above authorities barred years ago, and therefore there can be no difficulty about that third.

3.   Henry, a son of Samuel, died before his father, leaving a son said to have been named Samuel.   He left Baltimore during the civil war—went South and joined the Confederate Army.   He has never been heard of since and is thought to be dead.   If he is still living, it is apparent he would be barred from recovering this property, as the statute had commenced to run against him before he left Baltimore, and the time allowed, even if he was then under age, has long since expired.   If he was killed during the war, as is supposed, and was unmarried, his uncle George inherited his interest under our Statute of Descents, and what we have said about his own third is sufficient as to this.   Without referring to other contingencies about his death, we think the record discloses enough to make it reasonably certain that no trouble can arise from that interest, under the authorites above cited.

4. The only remaining interest is that of the Mitchells. Elizabeth Hiner, the daughter of Samuel, married Joseph Mitchell. She died before her father, and her husband and two sons survived her. The sons went to California before their grandfather's death, and were then minors. George H. Hiner, a nephew of Samuel, testified that he saw them there in 1868. The testimony is not clear as to what became of them after that time, but A. Dumas Jones, whose mother was a niece of Samuel Hiner, testified that he knew Joseph Mitchell, the father of the two Mitchells above referred to, but he never knew the two grandsons. He said his mother, who died in 1899, told him at least fifteen years before his testimony was taken (1903) that they were both dead. George H. Hiner did not know whether they were living or dead, excepting from the statement of A. Dumas Jones, who was in Baltimore more than ten years before he testified (1902) and then told him, George, that they were both dead. Mrs. Hughes, who has the Hiner family Bible, does not know whether the Mitchells are dead or not, but she was told eighteen or twenty years before her testimony was taken (1902) that Joseph, the youngest Mitchell, was still living, and she added "I have never heard of either of their deaths." Although they were both minors and non-residents when Samuel Hiner died, if they are still living, they were of course long since of age, and there would no longer be any disability by reason of their minority, as their grandfather died forty-five years ago. The testimony of Mrs. Hughes was that the Bible shows that Samuel Mitchell was born August 25th, 1842, and his brother Joseph February 15th, 1841—she afterwards corrects the latter to 1856, but doubtless meant 1846, as she spoke of him being the same age as her brother, who was then fifty-seven. But at any rate they long since reached their majority, if still living, and the only question therefore we have to consider in this connection is their non-residence. If the testimony be accepted as sufficient to prove their deaths, it shows that both died more than ten years ago, and hence any heirs they may have left would now be barred, as the statute only saves their

right to sue for ten years from the death of the ancestor under disability. *Carter* v. *Woolfork, supra.* If on the other hand, they or either of them, be not dead, or died less than ten years ago, the right to sue would not yet be barred, unless the Act of 1894, ch. 661 (Art. 57, sec. 6A of Code), is applicable, as suggested by the appellee, and we will therefore now consider that.

It was approved April 6th, 1894, and is as follows: "The period within which any suit or action may be brought under any Statute of Limitations in force in this State, shall not be extended because the plaintiff in such suit or action was, is or shall be a *feme covert*, imprisoned, or beyond the seas, or out of the jurisdiction of this State at the time of the accrual of the right, title or cause of action." That statute did not provide for its taking effect at a future time, and the only time allowed was until the first day of the following June, as it did not expressly declare when it should take effect. *Const., Art. III*, section 31. It is an important statute and it is not easy to understand why under existing conditions in this country the laws of a State should discriminate in favor of those residing in another State. But under the construction placed on the Statute of 21 James the First by our predecessors, it was not a bar to recovery by non-residents, unless they failed to institute their action within ten years next after their coming into this State, although the property might have been held adversely by the defendant for twenty or more years. If then the Mitchells are still living, and have never come into this State since possession was taken by McComas, they had a vested right to sue when the Act of 1894 was passed (unless there be some reason to the contrary besides the adverse holding), and the Legislature could not take away that right without allowing some reasonable time within which they could sue. That being so, this Act cannot be construed to take from them such right at the time it went into effect, but notwithstanding its broad and comprehensive language we see no difficulty in applying to it the principles announced in *Garrison* v. *Hill*, 81 Md. 551. There the statute under consideration read that

"*no* will    *   *   *    shall be subject to caveat or other ob-
jections to its validity after the expiration of three years from
its probate." We held that inasmuch as the Legislature
could not take away the vested right to file a caveat, and
yet it was apparent that it undertook to apply the law to all
wills, the limitation fixed by the statute should commence to
run when the proceeding to effect the validity of a will was
first subjected to the operation of the statute, which as to
one already probated three years or more would be the date
of the passage of the Act, it taking effect at that time. The
cases there cited, and others that might be, fully sustain that
view. We also said "There is no difficulty in applying this
statute to wills probated after the passage of the Act, nor
would there be any legal objection to making it applicable to
wills probated within such time before the Act was passed as
would still give those interested a reasonable time within which
to commence proceedings." So in this case, inasmuch as
more than twenty years had elapsed when the Act of 1894
was passed since Mr. McComas commenced to hold this prop-
erty adversely, the Mitchells, if living, could have sued within
ten years from the time they came within this State, "*and at
no time after the said ten years*" as the Statute of James ex-
pressly provides, and therefore under this construction of the
Act they would have ten years from the time it took effect,
which was the first day of June, 1894. We cannot therefore
say that the Act of 1894 removes all danger, if there be any,
although in a few months it will effectually dispose of any
right to sue by reason of the non-residence of the Mitchells, if
living, and we must therefore determine the question inde-
pendent of that Act.

It must be conceded that a disability, such as is referred to
in this statute, is never presumed to exist and must be affirm-
atively proven by the party alleging it, but where one party
seeks the aid of a Court of equity to require another to take
property, the title to which the vendor agreed should be good
and merchantable, and when the testimony offered by the ven-
dor himself leaves a material question in doubt, the purchaser

ought not to be required to take such risk.  The appellee himself proved that the two Mitchells were non-residents when their title accrued, and has not offered any evidence to show that they, or either of them, ever returned to Maryland. The only evidence of the death of either of them is that of A. Dumas Jones, who never knew them, and can only speak of what his mother told him.  There is nothing to show what opportunities for knowledge of the subject she had, and Mrs. Hughes, who had the family Bible, and who was a witness for the appellee, said: "I was told about 18 or 20 years ago that Joseph, the youngest son was living, and they may both be living for all I know.  I have never heard of either of their deaths."  George H. Hiner saw them in 1868 in San Francisco, and he did not know whether they were still living or not.  It would seem that it ought to be possible to obtain more definite information on the subject than this, and although we do not determine that the appellee has not acquired a good title by possession, we do not think, as the case now stands, that the appellant should be required by the Court to take the property.  Indeed, it may be conceded that if this was an action of ejectment the testimony would be sufficient to sustain the title of the appellee, as the burden would be on the party relying on the disability to establish it, but inasmuch as there is a reasonable doubt whether the Mitchells are dead and inasmuch as, if they are living, their right to sue for the recovery of the property still continues, the principles announced in *Fry on Specific Performance* and quoted in *Gill* v. *Wells*, 59 Md. 494, and *Sharp Street Station* v. *Rother*, 83 Md. 289, are applicable.  We will only quote from the last paragraph which says: "The Court when fully informed must know whether a title be good or bad; when partially informed, it often may and ought to doubt."  The rule adopted by Courts of equity in cases of this kind has been changed.  At one time the rule was to decide in every case whether the title was good or bad, and to decree accordingly, but now the Court does not usually decide "whether the title was absolutely good or absolutely bad, but whether it was so clear and free from

doubt, that the Court would compel the purchaser to take it, or whether it was one which the Court would not go so far as to decide it to be bad, but at the same time was the subject of so much doubt that a purchaser ought not to be obliged to accept it.   In other words, whatever may be the private opinion of the Court as to the validity of the title, yet if there be a reasonable doubt, either as to matter of law or matter of fact involved in it, the purchaser will not be enforced to take it."   _Levy_ v. _Iroquois Co._, 80 Md. 304.   Applying that to this case, we cannot compel the purchaser to accept this property under the testimony in the record, as to the Mitchell's interest, which is left in too much doubt.

We do not see any difficulty about the proceeding under which the appellee purchased the property, in so far as it affects the interest held by Mr. McComas.   It is conceded that it was not valid against the Hiner heirs, and hence we need not further discuss it.

We will reverse the decree and remand the cause so that the appellee can take further testimony if he desires to do so, within such reasonable time as the Court below shall fix.   If he does not so desire, or fails to take testimony within that time, the bill should be dismissed.

_Decree reversed and cause remanded,_
_the appellee to pay the costs._

(Decided January 13th, 1904.)