[No. 1892]

## THE STATE OF NEVADA, EX REL. L. F. WHITE, RELATOR, *v.* D. S. DICKERSON, LIEUTENANT-GOVERNOR AND ACTING GOVERNOR OF THE STATE OF NEVADA, RESPONDENT.

1. CONSTITUTIONAL LAW—LEGISLATIVE POWERS.

    The legislature, representing the people of the state, has the sole authority to enact and repeal statutes, and in this regard its power is supreme in all matters of government, where not prohibited by constitutional limitations, state or federal.

2. CONSTITUTIONAL LAW—ENCROACHMENT ON LEGISLATURE.

    Questions relating to the wisdom, policy, and expediency of statutes are for the people's representatives in legislature assembled, and not for the governor or the courts to determine.

3. CONSTITUTIONAL LAW—DISTRIBUTION OF GOVERNMENTAL POWERS.

    Each of the three departments of government, the legislative, executive, and judicial, is supreme in the powers conferred upon it by the constitution, and no department has the right to control or interfere with the powers delegated to another department.

4. CONSTITUTIONAL LAW—ENCROACHMENT ON EXECUTIVE.

    Neither the legislature nor the courts can compel the governor to perform acts which would be in conflict with the powers and prerogatives conferred upon him by the constitution.  As to these he is absolute.

5. CONSTITUTIONAL LAW—ENCROACHMENT ON LEGISLATURE—POWERS OF GOVERNOR.

    The governor may recommend the passage of laws, and may veto bills passed by the senate and assembly; but when an act not in conflict with the constitution passes both houses of the legislature, and is approved by him or passes over his veto, it becomes binding, and no person is above a law so enacted.  As he cannot prevent its passage over his veto, he is powerless to set aside a statute after it has become a law.

6. MANDAMUS—SUBJECT OF RELIEF—MINISTERIAL DUTY OF GOV-
ERNOR.

The governor may be required to comply with an act of the
legislature, approved by the chief executive at the time of its
passage, which directs him to perform a ministerial duty which
could have been enjoined upon any other officer or agent of
the state, and which is in no way limited by or relates to the
gubernatorial powers or privileges specified in the constitution.

7. CONSTITUTIONAL LAW—EXECUTIVE—NATURE OF POWERS.

The provision in the act entitled "An act to require the
acceptance and collection of grants, devises, bequests, donations,
and assignments to the State of Nevada," approved February
26, 1901 (Stats. 1901, c. 19), that "whenever any grant, devise,
bequest, donation, or gift or assignment of money, bonds, or
choses in action shall be made to this state, the governor is
directed to receive and accept the same, so that the right and
title to the same shall pass to the state," imposes a ministerial
duty upon the governor which could have been conferred as
well upon any other officer or person, and which in no way
conflicts with or pertains to the constitutional powers or pre-
rogatives of the governor, excepting that it is his duty to
enforce this and other statutes under section 7 of article 5 of
the constitution, which provides that "he shall see that the laws
are faithfully executed." He is nowhere empowered to set aside
the law because he may not agree with its policy. He is as
much unauthorized to prevent the reception of the bonds as if
the legislature had directed the state treasurer instead of the
governor to accept them for the state.

8. MANDAMUS—SUBJECT OF RELIEF—PERFORMANCE OF MINISTERIAL
DUTIES BY ACTING GOVERNOR.

As the supreme court is authorized to finally construe the
laws, and is empowered by the constitution and statute to
issue writs of *mandamus* "to compel the performance of an act
which the law specifically enjoins as a duty resulting from an
office, trust or station." and as the lieutenant and acting gov-
ernor is in no way excepted from these provisions or empow-
ered to abrogate the statute, a writ of *mandamus* will issue
directing him to comply with the requirement of the act of the
legislature and accept the bonds, the same as a writ would
issue requiring any other officer or person to perform in com-
pliance with the statute, a ministerial act, where no discretion
is imposed and no constitutional provision is infringed. Other-
wise, he could refuse, contrary to the statute, and merely for
reasons of his own, to accept cash, or United States or other
bonds, of the value of hundreds of thousands or millions of
dollars, tendered for the benefit of the university, or schools,
or charities of the state, or could decline to observe or obey any
other act of the legislature, notwithstanding he is especially
obligated by his oath and by the constitution to faithfully exe-
cute the laws.

9. COURTS—AMOUNT IN CONTROVERSY—PLEADING AND PROOF.

As the constitution authorizes the issuance of writs of *mandamus* regardless of the value involved, and the bonds tendered with their coupons are of the face value of over $400,000, and the respondent introduced no proof to support the allegations in his answer that the bonds are of no value, their value, which depends upon the result of a suit, need not be proven in advance by the petitioner in order to entitle him to a writ of mandate requiring their acceptance preliminary to a suit to determine their validity, and which would also establish their value. As with other negotiable instruments their value is presumed.

10. COURTS—JURISDICTION—AMOUNT IN CONTROVERSY.

If any amount is required to authorize the issuance of a writ of mandate when there is a real contest, the amount in controversy, which ordinarily controls in determining the jurisdiction of the courts, may be considered to be the same in a *mandamus* proceeding preliminary and incidental to an action on the bonds that it would be in a suit to recover judgment upon them, which is their face value. In suits upon notes and bonds and in actions for damages, it is not necessary to prove the value of the claim in advance of the trial.

11. MANDAMUS—PROCEEDINGS—ISSUES.

Doubtful questions relating to the legality or validity of, or right of recovery upon, bonds, or to their repudiation, or the statute of limitations, and which may be properly tried and adjudicated in an action between the holder and the obligor, need not be determined in the absence of the obligor in a proceeding for a writ of mandate requiring their acceptance by the chief executive preliminary to the bringing of a suit for the recovery of a judgment upon them against the obligor. It is not the duty of the chief executive nor of the courts upon application for writ of mandate to determine these questions in advance and possibly adversely to the acceptance of the bonds by the state and to their validity so as to set aside the statute and will of the legislature, prevent a suit, and deprive the proper tribunal, the Supreme Court of the United States, passing upon the objections made to the legality of the bonds.

12. MANDAMUS—DISCRETION OF COURT.

If the court has any jurisdiction to refuse the writ of mandate relating to a matter concerning the public interest, where a party is clearly entitled to it, it ought not to exercise that discretion by refusing the writ when such refusal would abrogate the plain language of the statute.

13. CONSTITUTIONAL LAW—ENCROACHMENTS ON LEGISLATURE AND JUDICIARY.

The contention of the lieutenant and acting governor that the acceptance as directed by the statute of repudiated bonds of a sister state, tendered to this state as a donation, would disturb the harmonious relations existing between the two states, and that for certain legal reasons the bonds cannot be

collected, raises a question for the legislature in the first instance and for the judiciary in the second, neither of which is within the functions of the executive or justifies his refusal to accept the bonds.

14. MANDAMUS—SUSPENSION OF WRIT GRANTED.

The lieutenant and acting governor having refused to accept, pursuant to the terms of the statute, repudiated bonds of the State of North Carolina, of the face value of over $400,000, upon the ground, among others, that their acceptance would tend to disturb the friendly relations existing between the states, and a writ of mandate requiring such acceptance having been ordered upon the eve of the convening of the legislature, the execution of the writ will be stayed in order to give that body, which has sole control of the legislative policy of the state regarding matters of such public interest, an opportunity to determine whether it will, for the reasons advanced by the executive, or for other considerations, amend the law so that the acceptance of the bonds by the state will not be required.

NORCROSS, C. J., dissenting.

ORIGINAL PROCEEDING. *Mandamus* by the State, on the relation of L. F. White, against D. S. Dickerson, Lieutenant-Governor and Acting Governor of Nevada. **Writ granted,** and service and execution thereof suspended.

STATEMENT OF FACTS

Relator alleges that he is a citizen and taxpayer of the State of Nevada, and that he brings and prosecutes this proceeding in his own behalf and for and on behalf of all other taxpayers of the state; that the owners and holders of 145 bonds of the State of North Carolina, of the par value of $401,170, donated and tendered them to respondent, as acting governor, for and on behalf of the state, pursuant to the terms and requirements of an act of the legislature entitled "An act to require the acceptance and collection of grants, devises, bequests, donations and assignments to the State of Nevada," approved February 26, 1901 (Stats. 1901, c. 19), and that the respondent failed and refused to accept or receive the bonds as required by the terms of this act.

In his answer respondent admits that the bonds were tendered to him as lieutenant and acting governor, pursuant to this act of the legislature, and that he refused

to accept or receive them on behalf of the state as a donation or otherwise. He alleges in the answer, upon information and belief, that the bonds are a part of several bond issues of the State of North Carolina made in the years 1868, 1869, and 1870, in aid of certain railroad companies, aggregating $11,407,000, and that these bond issues were authorized and made as a result of a conspiracy to defraud the State of North Carolina, and without any valuable consideration.

He further alleges that the bonds were declared invalid and uncollectible by an act of the legislature of the State of North Carolina, ratified November 23, 1874, and by a constitutional amendment adopted by the people of that state in 1880; that the 145 bonds tendered are a part of 11,407 bonds authorized and issued, leaving 11,262 bonds of the par value of $11,262,000, owned by individuals residing out of the State of Nevada, who are without any legal right or remedy for the enforcement of the payment thereof, and which bonds remain unpaid by reason of the inhibition of the eleventh amendment of the constitution of the United States, which provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another state or by citizens or subjects of any foreign state."

Respondent has further answered that the 145 bonds tendered are barred by the statute of limitations of the State of North Carolina; that by reason of the declaration of invalidity of these bonds by the legislature of that state, and by the people as expressed in the constitutional amendment of 1880, and because of the fact that the owners or holders of these bonds are without legal remedy or right to enforce collection owing to the eleventh amendment to the federal constitution, and because the bonds are barred by the statute of limitations of the State of North Carolina, they are without any real value in fact, unless it be a small speculative value arising out of the possibility of an adjudication of their validity in the fed-

eral courts as a result of their acceptance by the respondent, and the institution of suit by the State of Nevada or some other state under similar circumstances to recover thereon; that the acceptance of the bonds would not benefit the State of Nevada, or its university or public schools or charities, for the reason that the bonds are of no value; that the acceptance of them would impose upon this state a heavy burden of expense incident to the litigation necessary to their enforcement; that their acceptance and attempted enforcement would tend to disturb the friendly relations now existing between the people of the State of North Carolina and the people of the State of Nevada; that the tender of the bonds is not made in good faith or for the purpose of donating to or bestowing upon the State of Nevada or its university or schools or charities any valuable thing, but on the contrary for the sole purpose of insuring the bringing of a suit in the federal courts by the State of Nevada against the State of North Carolina for the enforcement of the payment of the bonds and interest coupons thereto attached, with the desire and expectation on the part of the owners and holders of the bonds, over and above the 145 bonds tendered, the balance of the issues of bonds before mentioned, amounting to 11,262 bonds of the par value of $11,262,000, and of obtaining from the State of North Carolina, by reason of such suit and adjudication, a compromise and settlement as to the other bonds so issued; that the Nevada statute referred to before is violative of section 20, article 4, of our state constitution, which provides: "The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * giving effect to any invalid deeds, wills or other instruments."

It is alleged in a supplemental answer that the holders of the bonds are without litigable right or lawful forum or any remedy for their enforcement: First, because there is no law, either constitutional or statutory, in the State of North Carolina permitting suit to be brought in the courts of that state against the State of North Carolina,

other than section 9, article 4, of the North Carolina constitution, which provides: "The supreme court shall have original jurisdiction to hear claims against the state, but its decisions shall be merely recommendatory; no process in the nature of an execution shall issue thereon; they shall be reported to the next session of the general assembly for its action." Second, that it has been held by the Supreme Court of North Carolina in the cases of *William Horne* v. *State*, 84 N. C. 362, and *Baltzer* v. *State*, 104 N. C. 265, 10 S. E. 153, that even the recommendatory jurisdiction given the supreme court by the constitutional provision above recited is abrogated in respect to claims based upon any bonds issued by the State of North Carolina in the years 1868, 1869, and 1870, by the provisions of section 6, article 1, of the constitution of that state, being the amendment adopted in 1880 as before stated.

It is also alleged in the supplemental answer that the issuance of a writ of mandate against the respondent requiring him to accept the bonds for the State of Nevada would be violative of article 3 of the constitution, which provides that the powers of the state government shall be divided into legislative, executive, and judicial departments, and that no person charged with the exercise of the powers properly belonging to one of these departments shall exercise any functions pertaining to either of the others except in cases therein expressly directed and permitted. And finally, that the Nevada statute before mentioned, by its terms, vests in the governor of the state a discretionary power in respect to the acceptance of any property that may be tendered him for the state, and that he is not required to accept property under its provisions until after he has reported its tender to the legislature.

*Campbell, Metson, Drew, Oatman & Mackenzie,* for Petitioner:

This is a case involving purely public right.

The cases recited by respondent are not authorities to

the point that in a case involving a matter *publici juris* the court has any discretion to deny relief.

On the contrary there is an abundance of unquestioned authority on the proposition that in a case involving a matter *publici juris* the discretion which the court may exercise in a matter involving private right does not exist.

In 19 Am. & Eng. Ency. Law, p. 753, it is said: "Public and Private Rights—Courts have discretion as to issuing the writ in aid of private rights, but when it is invoked in matters of public right there is no discretion." Citing *State* v. *Lehre*, 7 S. C. 270; *State* v. *Doyle*, 40 Wis. 220; *New Haven Company* v. *State*, 44 Conn. 390.

In 26 Cyc., p. 146, it is said: "State Cases—Where the writ is applied for by the state for the public benefit it has been held that the court has no discretion to refuse it."

In 19 Am. & Eng. Ency. Law, p. 753, it is said: "*Mandamus* and injunction are upon the same footing as regards the question of discretion." Citing *Savanah Canal Co.* v. *Shuman*, 91 Ga. 402.

In reference to this distinction between matters of private right and public right in so far as the discretion of the court is concerned, in vol. 1, Spelling, Injunctions and Extraordinary Remedies, sec. 22, in reference to the writ of injunction, it is said: "A distinction has been drawn between cases where it is sought in aid of private right, and where it is asked in some matter *publici juris*. In the latter class of cases, it is held that the remedy being in the nature of a prerogative remedy, when sought by the attorney-general in behalf of the people, courts have no judicial discretion in the matter of granting the writ, but an absolute duty devolves upon them to exercise their jurisdiction to accomplish the public object."

The case of *State* v. *Doyle*, *supra*, was an application for a writ of mandate to the secretary of state. The court says: "It is true that courts have discretion in issuing writs of *mandamus* merely in aid of private right. But when the writ is invoked on behalf of the state, as a

pure prerogative writ, in matters *publici juris*, there is no discretion. The writ goes *ex debito justiciæ*, without discretion."

In *Attorney-General* v. *Railroad Companies, supra*, the court says: "It is true that it is said that the granting or withholding of an injunction rests in the sound discretion of the court. But that is judicial discretion, not wilful choice. And the rule is applied to injunctions in aid of private remedies. The same rule applies to *mandamus* in cases of private right. But it does not apply to the application of a writ to things *publici juris*. There the writ goes *ex debito justiciæ*. The court has no discretion to withhold."

The case of *New Haven Company* v. *State*, 44 Conn. 376, was a proceeding to compel a railroad corporation to perform a public duty imposed upon it by law. Referring to the question of the discretion of the court sought to be invoked by the respondent therein, the court says: "No doubt can exist that in a case like the one in the court below, where the writ is applied for to enforce an act of the legislature for the public benefit and there is no other adequate remedy for its enforcement, the state or its attorney is entitled to the writ as of right, and there is no discretion in the court to refuse it. (Tapping on *Mandamus*, 54, 56, 288; 2 Dil. on Mun. Corp., sec. 695.)"

Admittedly the taxpayer, petitioner in the case at bar, sues in a purely representative capacity, declaring upon purely public rights, the state being the petitioner on the relation only of the taxpayer. The distinction which is made in the matter of discretion as applied to public right as distinguished from private right beyond question renders inapplicable to the case at bar all the general authorities cited by counsel. And we have been unable to discover any cases which militate against the doctrine laid down in the authorities cited above as to the want of discretion where the subject-matter is purely a matter *publici juris*.

But the case at bar, in addition to its not coming within the authorities cited as to discretion in matters of private

right, because involving purely public right, does not present any features which would render such authorities applicable. The discretion which may be exercised in certain cases involving private rights is not arbitrary discretion or one that may be exercised in accordance with the will or inclination of the court, as distinguished from the will of the law. It must be a sound legal discretion to be exercised in accordance with established rules of law. And if the petitioner's right is clear the writ must issue, unless facts are presented which upon some well-established rule would authorize the court to deny the writ. The authorities unanimously negative the proposition that the court may refuse to issue the writ where the petitioner's rights are based upon statute upon any theory that there is any impolicy or inexpediency in the provisions of the law or that the law violates any principle of natural justice. There is no case which holds that the court has any discretion in construing a statute.

In the famous case of *Osborn* v. *United States Bank*, 22 U. S. 738, 866, Chief Justice Marshall, speaking for the court says: "Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the legislature; or, in other words, to the will of the law."

In Spelling, vol. 2, sec. 1371, referring to the discretion vested in courts to deny the mandate where private rights are involved, it is said: "When it is said that granting or refusing the writ rests in the discretion of the court, it is not meant that the court's discretion is absolute, because where a clear legal right to a writ of mandate is shown the court has no discretion about granting the writ."

In Words and Phrases Judicially Defined, vol. 5, p. 4327, referring to cases involving private right, it is said concerning the question of discretion in cases of mandate: "This discretion is a legal, not an arbitrary, one and is to be exercised in accordance with the established rules of law. There is no power to deny the writ arbitrarily where a case comes squarely within such rules."

In 19 Am. & Eng. Ency. Law, p. 753, it is said: "But in all cases where there is a clear legal right and no other adequate remedy the writ ought to be granted in order to prevent failure of justice."

It is admitted that the statute involved in the case at bar is mandatory in its terms. If this case comes within the terms of the statute, and we cannot conceive that it will be otherwise determined, then the only matter that would appear to present itself for determination by this court would be, What is the will of the law? The act being mandatory, and this case coming within its provisions, there necessarily follows that the governor has a clear legal duty to accept the bonds in question. That being so, and there being no other remedy at law, we take it that this court cannot properly deny the writ upon any disinclination to interfere with the action of the governor. To do so would appear to us to deny the writ upon the theory that this court should not seek to control the discretion of the governor, and this would involve a finding that the governor was given discretion under the statute.

If the will of the law be, as expressed by the legislature in the statute, that the duty shall be mandatory, then we take it that the confidence which this court may have in the good judgment of the governor in refusing the tender and the natural disinclination this court may feel to force the governor to act contrary to his judgment cannot be proper matters upon which may be based any "discretion" warranting the denial of the writ; and this is assuming, for the purpose of argument, that the court would have any discretion in a matter of public right. If this court predicated the refusal of the writ

upon the above considerations, we submit that it would in effect be directly subverting the purpose of the legislature to render the duty of the governor mandatory.

We are at a loss to see what features the case at bar presents which bring the case within any of the well-established rules of law upon which a discretion to deny the writ may be predicated.

In *State* v. *Cummings,* 36 Mo. 263, 278, it is said: "It is not for the judiciary to inquire whether laws violate the general principles of liberty or natural justice, or whether they are wise and expedient or not. They can only declare whether they are repugnant to constitutional provisions and limitations. It would be a violation of well-established and safe principles for courts to resort to any other test. There is no higher law by which we can be governed. An attempt by judicial construction to obstruct a law, or a failure to enforce it, would be monstrous usurpation. We cannot make or repeal a law; we are not entrusted with any such power. If it is wrong, unjust or oppressive, an appeal must be made to the people in their political capacity at the poll, to apply the remedy. We will not attempt to exercise judicial legislation. We can scarcely conceive of anything that would be a compensation för introducing into our jurisprudence such a pernicious doctrine. The most odious and dangerous of all laws would be those depending upon the discretion of judges. Lord Camden, one of the greatest and purest of English judges, says 'that the discretion of a judge is the law of tyrants; it is always unknown; it is different in different men; it is casual, and depends upon constitutions, temper and passion. In the best it is oftentimes caprice, in the worst it is every vice, folly and passion to which human nature can be liable.' "

*Horatio Alling,* for Respondent:

The granting of the writ of mandate is dependent upon the exercise of a wise judicial discretion and is not a matter of absolute right. (19 Am. & Eng. Ency. 751; 26 Cyc. 143; Merrill on *Mandamus,* sec. 62; *People* v. *Little*

*Rock*, 215 Ill. 488; *People* v. *Board of Supervisors Adams Co.*, 185 Ill. 288; *People* v. *Ketchum*, 72 Ill. 212; High, Ex. Leg. Rem., 3d ed., sec. 6.)

In exercising such discretion the court will consider all the circumstances, reviewing the whole case, with due regard to the consequences of its action. (Merrill on *Mandamus*, sec. 63.)

As to consideration, affecting the exercise of the court's discretion, see 19 Am. & Eng. Ency. 753.

The interest of the general public may be considered. (19 Am. & Eng. Ency. 754, note 3; 2 Spelling, Ex. Relief, sec. 1372.)

The granting of a writ of *mandamus* to enforce merely private rights is a matter of sound legal discretion, and, notwithstanding the clear legal right and the absence of a legal remedy, it may be refused if circumstances make it unwise or inexpedient to grant it. (*Effingham, Maynard & Co.* v. *Hamilton*, 68 Miss. 523; *State ex rel. Phelan* v. *Board of Education of Fon du Lac*, 24 Wis. 683.)

The writ of mandate will not issue to compel the performance of an act which will work a public or private mischief, or to compel a compliance with the strict letter of a law in disregard of its spirit and in aid of a palpable fraud. (*People ex rel. Wood* v. *Board of Assessors*, 137 N. Y. 201.)

The granting of the writ of mandate, even when the right thereto is clear, lies in the sound discretion of the court; and where the court can see, upon a review of the whole case, that public interest and business will be thereby prejudiced and hindered, or the rights of third parties injuriously affected, without reasonable expectation of compensating benefits, the writ will be denied. (*Harris* v. *State*, 96 Tenn. 496, 516.)

The writ of mandate is not wholly a writ of right, but lies to a considerable extent within the sound discretion of the court where the application is made, and should not issue to compel a technical compliance with the letter of the law in violation of its plain intent and spirit, nor to

wrest a statute from its true purpose. (*Wiedwald* v. *Dodson*, 95 Cal. 450; *State* v. *U. S. Express Co.*, 95 Minn. 442.)

By the Court, TALBOT, J. (after stating the facts as above) :

This proceeding is based upon a petition for a writ of mandate, asking that the lieutenant-governor, who, under a provision in the constitution, has been the acting governor since the death of Governor Sparks, be required to accept, on behalf of the state, 145 bonds of the State of North Carolina, which, with their unpaid interest coupons, are of the par value of $401,170, under an act of our legislature approved February 26, 1901, entitled "An act to require the acceptance and collection of grants, devises, bequests, donations and assignments to the State of Nevada," which reads as follows:

"SECTION 1. That whenever any grant, devise, bequest, donation or gift or assignment of money, bonds or choses in action or of any property, real or personal, shall be made to this state, the governor is hereby directed to receive and accept the same, so that the right and title to the same shall pass to the state; and all such bonds, notes or choses in action or the proceeds thereof when collected, and all other property or thing of value, so received by the state as aforesaid, shall be reported by the governor to the legislature, to the end that the same may be covered into the public treasury, or appropriated to the state university or to the public schools, or to state charities as may hereafter be directed by law.

"SEC. 2. That whenever it shall be necessary to protect or assert the right or title of the state to any property so received or derived as aforesaid, or to collect or reduce into possession any bond, note, bill or chose in action, the attorney-general is directed to take the necessary and proper proceedings, and to bring suit in the name of the state in any court of competent jurisdiction, state or federal, and to prosecute all such suits, and is authorized to employ counsel to be associated with him in such suits and actions who, with him, shall fully rep-

resent the state and shall be entitled to reasonable compensation out of the recoveries or collections in such suits and actions." (Stats. 1901, c. 19.)

As reasons for respondent's refusal to accept the bonds, and against the issuance of a writ requiring their acceptance, numerous objections are made, as detailed in the foregoing statement of facts and issues. Among the more important of these, and illustrative of others, are the ones that the bonds were issued as the result of a conspiracy to defraud the State of North Carolina; that they were declared invalid by an act of the legislature and by a constitutional amendment in that state; that the bonds of the par value of $11,262,000, in addition to the ones of the par value of $401,170, are owned by individuals who are without remedy for the enforcement of their payment, because under the eleventh amendment to the federal constitution the persons holding them cannot maintain a suit against the State of North Carolina; that the bonds are barred by the statute of limitations of that state; that by reason of the declaration of invalidity expressed by the legislature in the constitutional amendment, the holders of the bonds are without remedy to enforce their collection, and that they are therefore without any real value, and that the acceptance of them would impose upon the state expensive litigation for their enforcement and would tend to disturb the friendly relations existing between the people of North Carolina and this state. The most of these objections and others raised, such as those which relate to the validity of the bonds, are grave judicial questions which might be determined in an action between the State of Nevada and the State of North Carolina, in which the latter would be entitled to appear and defend. These, and other serious questions, judicial in their nature, are for the courts, and not properly for the executive to determine. Whether North Carolina, acting as her own judge, and denying the holders of the bonds the right to enforce them, even in her own courts, can make such a constitutional and legislative repudiation of them, in

the nature of a declaration of a party in his own favor, as will prevent their enforcement in a disinterested tribunal such as the Supreme Court of the United States, and whether the statute of limitations would run after that state had abrogated any provision in its laws by which the holders of the bonds might bring suit and recover judgment, are not questions essential to be determined in this proceeding. The statute itself does not provide that the bonds must be of any value, but directs the governor to accept them, without specifying that he may decline to receive them if he believes they are without value or cannot be collected, or that the acceptance of them will not be for the best interests of the state. Courts may decline to consider matters which are trivial and regarding which there is no real controversy. Ordinarily the district court and the supreme court have jurisdiction where the amount is over $300, but the constitution confers upon this court the right to issue writs of *mandamus* without mentioning any amount as being necessary to give the court jurisdiction to grant the writ. State and federal statutes generally fix the jurisdiction of courts according to the demand or amount in controversy, which in this proceeding, incidental to a suit for recovery on the bonds, may be considered their face value, the same as in a suit directly upon them. Neither this court nor any officer is greater than the organic act under which the state and the court and officers are created. We ought not to usurp the rights of the people by amending into the constitution nor the powers of the legislature by judicially legislating into the statute a requirement that the value of the bonds must be proven before a suit can be maintained to recover upon them, when neither the constitution nor the act requires such value to be shown before this court can issue the writ of mandate. It is not necessary or usual in suing upon bonds or other negotiable instruments to allege or prove that they are of value. If it be conceded that unless they are of some value the lieutenant and acting governor is not required to accept them, being regular upon their

face and issued under a statute of North Carolina, they are presumed to be of par value; but whether of any value the holder, the same as the holder of other obligations or claims, is entitled to maintain an action to determine whether they are legally due, and if they are to judgment, even though the judgment may be valueless by reason of the inability of the defendant to pay.

No proof was submitted on behalf of respondent to support the allegation in his answer that the bonds are of no value. The statement of counsel for petitioner that the bonds were of the market value of 25 per cent of the face value, which is not directly denied, does not indicate that they may not be of greater value, or par value, when owned by the state, which, differently from individuals, can maintain an action to recover upon them. The value of the bonds to the state would be dependent largely upon the result of a suit. If litigants had to allege and prove the value of bonds and negotiable instruments in advance of maintaining a suit upon them, the burdens of litigation, already too great, might be doubled or greatly increased. The determination of whether the state shall accept the bonds may be safely left where it belongs and to the people's representatives in the senate and assembly; and, if the state does not accept them, the question of whether the State of North Carolina is legally liable to pay them is one which may be properly submitted to the Supreme Court of the United States, where it belongs. The prevention of the determination of these matters by the legislature and by the Supreme Court of the United States is not within the executive powers which the lieutenant and acting governor is authorized to exercise, nor is it the duty of this court to deprive the legislature of its right to determine whether the bonds shall be accepted, nor to prevent the questions relating to their validity, the decision of which pertains to judicial powers, from being submitted to the Supreme Court of the United States if the legislature desires that they be accepted. No reason is apparent

why this court should, in this special and preliminary proceeding, adjudicate and uphold the statutory and constitutional acts of North Carolina in repudiating the bonds, and denying to individual holders thereof the right to have the question of whether she is liable for the payment of them determined in her courts, as an excuse for nullifying the act of our own legislature. If the determination of the questions relating to the liability upon the bonds were necessary in this proceeding, as well as in a future action against North Carolina to collect them, it might appear that the principal objections made against their enforcement have alrealy been considered adversely to the contentions of respondent by the Supreme Court of the United States, in cases other than the one in which South Dakota recovered on donated bonds of North Carolina; and that in order to sustain the claim made on behalf of the lieutenant and acting governor that a judgment could not be recovered upon the bonds, we would have to undertake to reverse the opinions of the Supreme Courts of the United States and of North Carolina.

In consonance with the general principle established by numerous decisions, it was held in *Kneeland* v. *Lawrence Bros. & Co.*, 140 U. S. 209, 11 Sup. Ct. 786, 35 L. Ed. 492, that coupon bonds payable to bearer passed by delivery, and a *bona fide* purchaser of them before maturity takes them free from any equities that might have been set up by the original holders, and that the burden of proof is on the one who assails the *bona fides* of such purchase. It would be incumbent upon the defendant in a suit upon the bonds to plead and show that the action was barred by the statute of limitations, or this objection might be waived.

In *Wilcox* v. *Williams,* 5 Nev. 213, it was said: "No party is compelled to plead the statute of limitations; no court can infer from lapse of time apparent on the face of pleadings, that the statute has run."

In *Moore* v. *Smith,* 29 S. C. 254, 7 S. E. 485, the court

stated: "Where a just demand is presented, and the statute of limitations is interposed, that is new matter, and must be established by him who relies upon it."

In consonance with numerous decisions in other jurisdictions, the Supreme Court of North Carolina has often held that the statute of limitations is an affirmative defense, and must be pleaded and established by the party who relies upon it. (*Hooker* v. *Worthington*, 134 N. C. 283, 46 S. E. 726; *Bond* v. *Wilson*, 129 N. C. 387, 40 S. E. 182; *Gupton* v. *Hawkins*, 126 N. C. 81, 35 S. E. 229; *Parker* v. *Harden*, 121 N. C. 57, 28 S. E. 20; *Wood* v. *Barber*, 90 N. C. 76; *Hobbs* v. *Barefoot*, 104 N. C. 224, 10 S. E. 170; *Nunnery* v. *Averitt*, 111 N. C. 394, 16 S. E. 683; *Moore* v. *Garner*, 101 N. C. 374, 7 S. E. 732; *Graham* v. *O'Bryan*, 120 N. C. 463, 27 S. E. 122; *White* v. *Century Gold M. Co.*, 28 Utah, 331, 78 Pac. 868; *Borland* v. *Haven* (C. C.) 37 Fed 394; *Pierce* v. *S. P. R. R. Co.*, 120 Cal. 156, 47 Pac. 874, 52 Pac. 302, 40 L. R. A. 350; *Cann* v. *Cann*, 40 W. Va. 138, 20 S. E. 910; *Vail* v. *Halton*, 14 Ind. 344; *Lewis* v. *Mason*, 84 Va. 731, 10 S. E. 529; *Green* v. *Dodge*, 79 Vt. 73, 64 Atl. 499; *Hunter* v. *Hunter*, 63 S. C. 78, 41 S. E. 33, 90 Am. St. Rep. 663; *Barnet* v. *Houston*, 18 Tex. Civ. App. 134, 44 S. W. 689; *McDowell* v. *Potter*, 8 Pa. 189, 49 Am. Dec 503; *Kilbourne* v. *Sullivan Co.*, 137 N. Y. 170, 33 N. E. 159; *Moffet* v. *Farwell*, 222 Ill. 543, 78 N. E. 925.)

It seems also to be the rule in North Carolina, in the Supreme Court of the United States, and everywhere, that the time within which actions may be brought may be shortened if a reasonable time thereafter is allowed for the institution of suit, but that a litigant or claimant cannot be deprived entirely of his right to bring an action by an act of the state or legislature, as this would amount to a denial of justice. (*Wheeler* v. *Jackson*, 137 U. S. 245, 11 Sup. Ct. 76, 34 L. Ed. 659, affirming 105 N. Y. 681; *Saranac* v. *N. Y. Comptroller*, 177 U. S. 318, 20 Sup. Ct. 642, 44 L. Ed. 786; *Mitchell* v. *Clark*, 110 U. S. 633, 4 Sup. Ct. 170, 312, 28 L. Ed. 279; *Vance* v. *Vance*, 108 U. S. 514, 2 Sup. Ct. 854, 27 L. Ed. 808; *Sohn*

v. *Waterson,* 17 Wall. 597, 21 L. Ed. 737; *Terry* v. *Anderson,* 95 U. S. 628, 24 L. Ed. 365; *Culbreth* v. *Downing,* 121 N. C. 205, 28 S. E. 294, 61 Am. St. Rep. 661; *Nichols* v. *Norfolk R. R. Co.,* 120 N. C. 495, 26 S. E. 643; *Wilcox* v. *Williams,* 5 Nev. 206; *People* v. *Turner,* 117 N. Y. 227, 22 N. E. 1022, 15 Am. St. Rep. 498; *Fiske* v. *Briggs,* 6 R. I. 557; *Rodebaugh* v. *Phila. Traction Co.,* 190 Pa. 358, 42 Atl. 953; *King* v. *Belcher,* 30 S. C. 381, 9 S. E 359; *Boon* v. *Chamberlain,* 82 Tex. 480, 18 S. W. 655; *Smith* v. *Packard,* 12 Wis. 371; *Willard* v. *Harvey,* 24 N. H. 344; *Guiterman* v. *Wishon,* 21 Mont. 458, 54 Pac. 566; *Cranor* v. *School Dist.,* 151 Mo. 119, 52 S. W. 232; *Garrett* v. *Beaumont,* 24 Miss. 377; *Billings* v. *Hall,* 7 Cal. 1; *Hart* v. *Bostwick,* 14 Fla. 162; *Central Bank* v. *Solomon,* 20 Ga. 408; *Edelstein* v. *Carlile,* 33 Colo. 54, 78 Pac. 680; *Hill* v. *Gregory,* 64 Ark. 317, 42 S. W. 408; *Bradley* v. *Lightcap,* 201 Ill. 511, 66 N. E. 546; *Macnichol* v. *Spence,* 83 Me. 87, 21 Atl. 748; *Wooster* v. *Bateman,* 126 Iowa, 552, 102 N. W. 521; *Baumeister* v. *Silver,* 98 Md. 418, 56 Atl. 825; *Krone* v. *Krone,* 37 Mich. 308; *Russell* v. *Lumber Co.,* 45 Minn. 376, 48 N. W. 3; *Loring* v. *Alline,* 9 Cush. 68.)

Where it is provided that the payment of bonds is to be made in a particular way or out of a particular fund, the statute of limitations does not begin to run until the fund has been provided. (*Lincoln County* v. *Luning,* 133 U. S. 529, 10 Sup. Ct. 363, 33 L. Ed. 766; *State* v. *Lincoln County,* 23 Nev. 262; *Freehill* v. *Chamberlain,* 65 Cal. 603, 4 Pac. 646; *Robertson* v. *Blaine Co.,* 96 Fed. 63, 32 C. C. A. 512, 61 U. S. App. 242, 47 L. R. A. 459.)

That pursuant to an act of the legislature the courts will compel the levying of a tax for the purpose of paying a judgment recovered upon bonds has often been held. (*Supervisors* v. *U. S.,* 4 Wall. 435, 18 L. Ed. 419; *City of Galena* v. *Amy,* 72 U. S. 705, 18 L. Ed. 560; *City of Davenport* v. *U. S.,* 76 U. S. 409, 19 L. Ed. 704; *County of Greene* v. *Daniel,* 102 U. S. 187, 26 L. Ed. 99; *Lowell* v. *Boston,* 111 Mass. 460, 15 Am. Rep. 39; *U. S.* v. *New Orleans,* 98 U. S. 381, 25 L. Ed. 225; *State* v. *Clay,* 46

Mo. 231; *Shinbone* v. *Randolph,* 56 Ala. 183; *State* v. *Milwaukee,* 20 Wis. 87; *Stevenson* v. *Summit,* 35 Iowa, 462; *Com.* v. *Com. of Alleg. Co.,* 37 Pa. 277; *Cass Co.* v. *Johnston,* 95 U. S. 360, 24 L. Ed. 416; *Pegram* v. *County Com.,* 64 N. C. 557; Dillon on Municipal Bonds, 58; Jones on R. R. Securities, sec. 300.)

The objection that the acceptance of the bonds directed by the statute would tend to disturb the friendly and harmonious relations existing between the two states, and other questions relating to the wisdom or propriety of the statute, are for the legislature, and not for the executive or the courts to determine. It may be conceded that the courts could not, under any statute passed by the legislature, compel the governor to perform acts which would be in conflict with the powers conferred upon him by the constitution, and that he is absolute in all the prerogatives conferred upon him by that instrument. Neither the courts nor the legislature can deprive him of any authority conferred upon him by the constitution. The act in question is clear and positive in its direction that the bonds be accepted. It contains no qualification or condition that he may refuse to receive them for any reason. By its terms no discretion or judgment is vested in him. It does not relate to or infringe any of his constitutional prerogatives. The statute merely directs him to perform a ministerial act, and the legislature could have directed equally as well that bonds as a gift to the state should be accepted by the state treasurer or other officer or person. The constitution defines the powers of the governor, and provides clearly for the enactment of laws and the jurisdiction of courts.

If it be admitted that certain powers are vested in the governor by the constitution, which neither the legislature nor the courts can control, this act in no way relates to such powers, and is not governed or limited by any provision of the constitution, unless it be section 7, article 5, which states that "he shall see that the laws are faithfully executed," and the one giving him the right to recommend to the legislature that this or any other act

be repealed. When an act, not in conflict with the constitution, passes both houses of the legislature, and is approved by the governor or passed over his veto, it is binding, and no person is above a law so enacted. As he cannot prevent its passage over his veto, he is powerless to set aside a statute after it has become the law. Section 4, article 6, provides that this "court shall also have power to issue writs of *mandamus.*" Section 3542 of the Compiled Laws, passed by the legislature under its constitutional powers, directs that the writ may be issued to any person "to compel the performance of an act which the law especially enjoins as a duty resulting from an office, trust or station." Although the opinions of the lieutenant and acting governor, coming from the highest executive officer of the state, are entitled to great respect, there is nothing under our system of government which places him upon a pedestal above the laws enacted in accordance with the provisions of the constitution by the people's representatives in the legislature assembled. He, similarly with other public officers, is the chosen servant of the people. The members of this court, as well as the executive, are under an oath provided by the constitution itself to support its provisions. The one that "he shall see that the laws are faithfully executed" makes it even more incumbent upon him than upon ordinary citizens to yield obedience to the statute. The fact that with the best of motives, and on the highest of moral grounds, he may disagree with the will of the legislature as expressed in the statute cannot justify his failure or refusal to perform an act clearly required by its terms.

Notwithstanding that we, may agree with his conclusions as to the policy or expediency of the statute, and as citizens or legislators would favor its amendment, we, as well as the lieutenant and acting governor, are bound to observe the constitution and the statutes, including the provisions for the issuance of writs of *mandamus* when any person refuses to perform an act "which the law especially enjoins as a duty resulting from his office or station." He may recommend the passage of laws and

approve or veto bills after they have been passed by the
senate and assembly; he may recommend the repeal of
statutes which have become the law with or without the
governor's approval; but after they become the law, with
or without his approval, he is as powerless to set them
aside as other officers or individuals, and is, as we have
seen, especially enjoined by the constitution and more
obligated than ordinary citizens to have them enforced.
In the exercise of the powers conferred upon him by
the constitution which carry or imply any discretion,
such as those relating to the approval or vetoing of bills
or certain appointments of persons to office, his will is
absolute and his action beyond the control of the courts.
The constitution on which our government stands, and
without which it would fall, nowhere exempts the gov-
ernor from being required, the same as other officers, to
perform ministerial acts such as are required by this
statute, which in no way conflict with or pertain to his
constitutional prerogatives. If the chief executive may,
upon the ground that in his judgment it is not for the
best interests of the state, set aside this statute, he may
also for the same reason, and contrary to the constitu-
tional requirement that he enforce the laws, ignore other
statutes; and other officers and citizens, not specially
enjoined by the constitution to enforce the laws, would
have quite as much right as he to ignore statutes which
they did not deem wise or expedient.

In *Ex Parte Boyce,* 27 Nev. 331, 65 L. R. A. 47, adopt-
ing the language of Justice Harlan and the Supreme
Court of the United States in the Kansas case, we said:
"So, also, if it be said that a statute like the one before us
is mischievous in its tendencies, the answer is that the
responsibility therefor rests upon the legislature, not upon
the courts. No evils arising from such legislation could
be more far-reaching than those that might come to our
system of government if the judiciary, abandoning the
sphere assigned to it by the fundamental law, should
enter the domain of legislation, and, upon grounds
merely of justice or reason and wisdom, annul statutes

that had received the sanction of the people's representatives. We are reminded by counsel that it is the solemn duty of the courts, in cases before them, to regard the constitutional rights of the citizen against merely arbitrary power. This is unquestionably true. But it is equally true—indeed, the public interests imperatively demand—that legislative enactments be recognized and enforced by the courts, as embodying the will of the people, unless they are plainly and palpably, and beyond all question, in violation of the fundamental law of the constitution. In *Wallace* v. *City of Reno,* 27 Nev. 71, 63 L. R. A. 337, 103 Am. St. Rep. 747, we held that the people, and through them the legislature, had supreme power in all matters of government, where not restricted by constitutional limitations." These principles are applicable to the executive, and he is as void of power as the courts to set aside statutes because he may deem them unwise or inexpedient.

It may not tend to promote the best feeling for one state or neighbor or individual to acquire by gift or purchase, or otherwise, an indebtedness against another for the purpose of enforcing its collection; but to do so is not prohibited by any provision of the constitution. Individuals are daily acquiring, by gift, descent or purchase, indebtedness against others and bringing suits for the enforcement of the demands, and the courts provided by the constitution are open for the enforcement of these demands. There is nothing in the constitution which in the remotest degree inhibits one state from enforcing against another any demand, whether acquired by gift or otherwise, and the state is as free as an individual to accept evidences of indebtedness and to collect the amount due.

The claim that the bonds may not be accepted because the friendly relations existing between the two states would be destroyed is at variance with the decision of the Supreme Court of the United States in the case of *South Dakota* v. *North Carolina.* In that case repudiated bonds issued by North Carolina to aid railroads in the

years 1847, 1855, and 1866 were donated to South Dakota under a statute similar to ours. Suit was brought upon them, and judgment obtained by South Dakota against North Carolina in the Supreme Court of the United States in the year 1903. (192 U. S. 287, 24 Sup. Ct. 269, 48 L. Ed. 448.) Contrary to the contention made here, the supreme court held that South Dakota could recover notwithstanding the bonds had been donated to that state by holders who were seeking to collect other similar bonds, and that these holders were not necessary parties to the suit. Whether the State of North Carolina is legally liable for the payment of these bonds is not a question which can be properly determined in this proceeding. The fact that their market value is far in excess of the amount necessary to give this court jurisdiction, that grave doubt exists as to whether they may be enforced against North Carolina, and that the legislature has provided for their acceptance, is sufficient for the purposes of this action. If the State of North Carolina does not legally owe them, that will be a defense to be established in a suit if one is brought by this state against North Carolina. If the State of North Carolina legally owes the amount due upon them, there is nothing in the constitution which prevents this state from recovering if it accepts the bonds. If, on the other hand, the State of North Carolina does not legally owe the amount of the bonds, she would not have to pay them at the end of the suit. It can hardly be said that in passing our statute in question the legislature did not understand that it was for the purpose of accepting state bonds and enforcing their collection by litigation when the language of the act so plainly indicates that it was drawn for this purpose. Unless by future action the legislature deems, as a matter of policy or propriety, that it is better to amend the act or provide that the bonds shall not be accepted or enforced, it is the duty of the chief executive under the statute to accept them for the state. In one view the court is in the same position as the executive. It is the duty of the governor to enforce the law as he finds it,

and for the court to declare the law as it finds it, regardless of whether as citizens or legislators they would favor the repeal of the statute.

The cases are not uniform as to when or the circumstances under which *mandamus* will issue to control the action of the governor. That the writ will issue to compel the chief executive to perform a ministerial act is in accordance with the best authorities, and has been the law of this state for more than forty years, and since the issuance of the mandate of this court under a decision written by Chief Justice Beatty directing Governor Blasdel to sign and issue a patent for land. (*State ex rel. Wall* v. *Blasdel,* 4 Nev. 241.) It was said in the opinion that "if the law as passed is valid it must be enforced."

There was further recognition of the right to have the writ of mandate issue against the chief executive, when the conditions warrant, in the case of *Lieutenant-Governor Laughton* v. *Governor Adams,* 19 Nev. 370.

In the case of Waterman we discharged the petitioner from arrest under an executive order issued by the governor of this state upon the requisition of the governor of Iowa because the indictment did not state facts constituting a crime. (29 Nev. 288, 11 L. R. A. (N. S.) 424.)

In the case of *Gray* v. *State,* 72 Ind. 568, the court held that the writ of mandate will lie against the governor to enforce the performance of a ministerial duty not resting in his discretion, and that a ministerial act is one which a person performs under a given state of facts and in a prescribed manner in obedience to legal authority, without regard to his own judgment upon the propriety of the act being done.

In *Middleton* v. *Low,* 30 Cal. 597, it was held that when a ministerial duty is specially devolved upon the governor by law, which the legislature might have conferred upon any other state officer, the governor may be compelled to perform the same.

In *Harpending* v. *Haight,* 39 Cal. 189, 2 Am. Rep. 432, a writ was issued commanding the governor to cause to

be authenticated as a statute a bill in his possession which had passed both houses of the legislature.

In *State* v. *Salmon P. Chase,* 5 Ohio St. 528, it was held that although the governor, in the exercise of the supreme executive power of the state, may, from the nature of his authority, have a discretion which cannot be controlled by the courts, yet in regard to a ministerial act which might have devolved upon any other officer of the state, and affecting any specific private right, he may be made amenable to the compulsory mandate of the court by *mandamus.*

In *Chumasere* v. *Potts,* 2 Mont. 243, a writ was issued commanding the governor, with other officers, to canvass the vote.

In *Magruder* v. *Swan,* 25 Md. 175, it was held that the governor, like other officers, in the discharge of mere ministerial duties, is subject to the writ of *mandamus,* which cannot be denied to a suitor without acknowledging an authority higher than the law.

In *State* v. *Martin, Governor,* 38 Kan. 641, 17 Pac. 162, it was held that where purely ministerial duties are by statute imposed upon the governor, and these duties are only such as might be devolved upon any other officer or agent, their performance may be compelled by *mandamus* or injunction. The court said: "In the case of *Marbury* v. *Madison,* 1 Cranch. 163, 2 L. Ed. 60, Chief Justice Marshall uses the following language: 'The very essence of civil liberty consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection.' And further on in the same case, page 166 (1 Cranch. 2 L. Ed. 60), after stating that the courts cannot control executive discretion, the great chief justice uses the following language: 'But when the legislature proceeds to impose on that officer (the secretary of state of the United States) other duties; when he is directed peremptorily to perform certain acts; when the rights of the individuals are dependent on the performance of

those acts, he is, so far, the officer of the law; is amenable to the laws for his conduct, and, cannot at his discretion sport away the vested rights of others.' In the case of *Tenn. R. Co.* v. *Moore,* 36 Ala. 382, the following language is used: 'All this is but the result of the just and wholesome principle that no public functionary, whatever his official rank, is above the law, or will be permitted to violate its express command with impunity. While, therefore, it is true that, in regard to many of the duties which belong to his office the governor has, from the very nature of the authority, a discretion which the courts cannot control, yet, in reference to mere ministerial duties imposed upon him by statute, which might have been devolved upon another officer if the legislature had seen fit, and on the performance of which some specific private right depends, he may be made amenable to the compulsory process of the proper court by *mandamus.*' * * * Of course we should always presume that the governor intends to do his duty, but he may be mistaken as to the law, or he may not be sufficiently advised as to the facts upon which the applicant for relief founds his right thereto, and there is no way prescribed by law by which issues can be made up and tried before the governor as issues are made up and tried before the courts. The courts are created for the express purpose of trying controversies, while the other departments and ministerial officers are not. It is also claimed that if the courts may control the ministerial acts of the governor, and may also determine which are ministerial acts and which are not, then that the courts may determine everything, and obtain complete control over the entire executive department, including the governor. It must be remembered, however, that all controversies must be determined somewhere, and that the courts are the only tribunals created by the constitution and the laws for the special purpose of construing the constitution and the laws, and of determining controversies between parties, and the power to determine whether a given power is a truly ministerial power, or not, and whether an

applicant for relief in any particular case has a right to such relief under the law creating such power, or not, comes particularly within the province of the courts. And a determination in such a case is purely judicial, and is one of the things for which courts were created, and they could not refuse their aid in such cases without so far wholly abandoning their duties and abdicating their jurisdiction."

The United States Supreme Court, speaking through Chief Justice Marshall, in the case of *Osborn* v. *United States Bank,* 22 U. S. 866, 6 L. Ed. 204, said: "Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the legislature; or, in other words, to the will of the law."

In *State* v. *Cummings,* 36 Mo. 263, 278, it is said: "It is not for the judiciary to inquire whether laws violate the general principles of liberty or natural justice, or whether they are wise or expedient or not. They can only declare whether they are repugnant to constitutional provisions and limitations. It would be a violation of well-established and safe principles for courts to resort to any other test. There is no higher law by which we can be governed. An attempt by judicial construction to obstruct a law, or a failure to enforce it, would be monstrous usurpation. We cannot make or repeal a law; we are not intrusted with any such power. If it is wrong, unjust, or oppressive, an appeal must be made to the people in their political capacity at the polls to apply the remedy. We will not attempt to exercise judicial legislation. We can scarcely conceive of anything that would be a compensation for introducing into

our jurisprudence such a pernicious doctrine. The most odious and dangerous of all laws would be those depending upon the discretion of judges."

The petitioner has filed a special reply brief, citing extracts from numerous authorities holding that the courts have discretion as to the issuing of the writ of mandate in aid of private rights, but no such discretion when it is invoked in matters of public right. Among these authorities are: Tapping on *Mandamus,* 54, 56, 287, 288; 2 Dillon on Municipal Corporations, sec. 695; *New Haven Co.* v. *State,* 44 Conn. 376; *State* v. *Doyle,* 40 Wis. 220; Spelling on Injunctions and Extraordinary Remedies, sec. 22; *Savannah Canal Co.* v. *Shuman,* 91 Ga. 402, 17 S. E. 937, 44 Am. St. Rep. 43; 19 Am. & Eng. Ency. Law, 753. If the court has any discretion in a case like this one, it ought not to exercise it by denying the writ, which would result in a judicial repeal, the usurpation of the powers of the legislature, and a dangerous precedent. If the plain terms of this act may be thus set aside, no statute would be certain, no litigant or counsel would be sure of the law until finally announced according to the varying moods of the court, and no person would be secure in his rights. In Russia, the czar at pleasure sets aside the acts of the duma, passed by the people's delegates. The highest officers in this government, as well as kings and emperors in the leading constitutional monarchies of the world, are without power to set aside the laws of the country. The Young Turks deposed a sultan for his failure to observe the requirements of the constitution. For the purpose of giving soundness and stability to our laws, the people have wisely provided in the organic act of the state that bills, whether for proposed statutes or repeals, must pass both branches of the legislature, and have given the governor the power to veto or approve before they become effective. If this and other statutes, when their language and meaning are clear, could be set aside or ignored at the discretion or changing will of succeeding governors or courts, the laws might become nearly as uncertain and

unstable as the clouds that float above our mountain peaks. It cannot be implied that the governor has power to set aside the laws when he is specially enjoined by the constitution to enforce them.

For us to hold contrary to the plain meaning, that the constitutional provision that the governor shall faithfully execute the laws allows him to set them aside at will, would be a misconception, sarcasm, and travesty upon the organic act upon which the state stands.

If the members of the legislature agree with the views of the lieutenant and acting governor, they, and not he nor the courts, have the power to repeal or amend the law for the reasons he advances.

We cannot assume that the new executive, who will take office on the first of the year, will fail to follow the law as construed by the court, or refuse to obey the statute if it is not repealed or amended, or if the requirement of the act remain unabrogated.

The writ will issue as demanded in the petition; but in order to give the legislature, which is about to convene, and which is the only branch of our government having power to change a statute, an opportunity to consider the objections which have been made to the acceptance of the bonds, and to repeal or amend the act if it desires, the service and execution of the order will be stayed until the close of the sixty-day session of that body and the further order of the court.

SWEENEY, J., concurring:

I concur in the judgment of Justice TALBOT. I served in the legislature of Nevada in 1901 which enacted this measure, as a member of the assembly from Ormsby County. At the request of the then governor of Nevada, Governor R. Sadler, I introduced the bill in question "by request," which the legislative records disclose, authorizing the state to accept and collect grants, devises, bequests, donations, and assignments. The bill passed both houses of the legislature unanimously, and was signed by the governor. This statute is the only one of

its nature in our statute books which places this state
in a position to officially accept gifts, grants, devises,
bequests, donations, and assignments.   Under this act,
and by virtue of its terms, the officer designated in this
act to officially receive, so that the title might become
vested in the state, accepted, and the state received, from
Clarence H. Mackay the gift of $200,000 and other mone-
tary donations for our state university.

These North Carolina bonds, involved in the present
case, are the second gift offered to the state since the
passage of this act about ten years ago.   At the time of
the passage of this act before the legislature, no question
of policy or expediency as to the acceptance of state
bonds, such as are involved in the present case, was
debated or considered, and knowing personally that if
such a proposal of bonds was made as is involved in the
present proposed gift that I would not have voted as a
legislator for this bill, unless amended so as to avoid such
a necessity of enforcing the collection of bonds of the
character offered in the present case, by reason of con-
ditions existing at the time of their issuance and the
alleged questionable original indebtedness they were
issued to redeem, I would be pleased to see the incoming
legislature amend the law to cover this situation so as
to avoid this necessity.

As a judge of this tribunal, however, the law, as
enacted by the legislature, until amended or repealed by
the legislative department, must take its course, any
personal sentiment to the contrary notwithstanding.
Under the constitution of the United States, which is the
supreme law of the land, and the constitution of Nevada,
which we are obligated to obey under oath, we must order
enforced any valid law irrespective of sentiment, and
against any executive officer enjoined by law to a per-
formance of a ministerial duty if he fails to execute the
law.   In this great country of ours, as it should be, under
a constitution which was ordained to make all men equal
under the law, no man is above the law whether he be the
President of the United States or its lowliest citizen—

millionaire or pauper; and while in the British and other governments that have not as yet advanced to a republic like ours the people are satisfied with the doctrine that prevails that the king or ruling head is above the law and can do no wrong, yet in this country every American citizen is legally equal before the law, and it is the plain duty of all officers to obey the law which they by oath promise to do, and a writ of mandate should issue to enforce such performance.

I especially desire to emphasize my approval and concurrence in the opinion of Justice TALBOT to the effect that *mandamus* lies to enforce the nonperformance of a legal duty ministerially enjoined by law on the acting governor or any other executive officer, in view of the position taken so decidedly by the attorneys for the acting governor that *mandamus* will not lie against a chief executive of the state, and to check as far as lies in my power the constant and widespread attempt throughout the land to usurp the powers, which the framers of our constitution especially delegated and vested separately in the three coordinate branches of our government.

The present case typifies to a nicety the position I desire impressed, and the evil I desire checked, in the tendency of one department of our government to usurp the powers of the other, and which are expressly delegated by the framers of our government to the three coordinate branches, and discloses how courts and judges and executive officers, swayed consciously or unconsciously by sentiment, may usurp or encroach on the powers vested in other departments, and violate the spirit of our constitution, and which, if unchecked, will ultimately nullify the grandest scheme of government ever proposed by man.

The act in question was passed by the legislature, which has the sole power, subject to the veto power of the governor, to pass the measure. The act in plain terms states that the state shall accept state bonds, devises, bequests, and assignments. The question of

whether or not the legislature intended to place the state
in its present position of enforcing the collection of
state bonds of the character given them was not con-
sidered or debated by the legislature; but the fact
remains that the act states in plain, unambiguous, man-
datory terms "that whenever any grant, devise, bequest,
donation or gift or assignment of money, bonds or choses
in action or of any property, real or personal, shall be
made to this state, the governor is hereby directed to
receive and accept the same, so that the right and title
to the same shall pass to the state.    *    *    *  "

While personally we might wish that the act reposed
a discretion in the governor for the purpose of refusing
to accept the bonds proffered in the present case, yet, as
judges interpreting the law, we have no alternative
legally than to declare the law as we find it.   Personally,
I believe the state and its business should be conducted
on the same business plane as that of any private citi-
zen, and in so far as the acceptance of gifts is con-
cerned, the state ought to be in the same position to
accept or decline a gift, when the state's prestige or
standing might be injured in so accepting, and where it
is necessary to sue to enforce a voluntary gift.   It should
also be in a position to consider any strings attached to
the proposed gift, from whom, and the character and
nature of the gift; but these are matters to be remedied
solely by the legislative department, and not within the
province of the executive or judicial departments.

As to the discretion reposed in this court to refuse to
issue the writ of mandate, because of the alleged want
of value in the bonds, and on the principle that courts
will not deal with frivolous or valueless things, we are
legally precluded from so acting, because the bonds on
their face show a value of over $401,000, and a market
value of over $100,000, and the Supreme Court of the
United States and other courts, even including the
Supreme Courts of North Carolina and Nevada, have
held that bonds of a sovereign state are presumed to be
valid until otherwise shown, and the statute of limita-

tions does not run against the right of a sovereign state
to sue another sovereign state on bonds regularly passed
by the legislature of a sovereign state, even though a
legislature might later try to repudiate them. This
latter point was directly passed on in a case which went
to the United States Supreme Court, where the bonds
in question were issued by Lincoln County, Nevada, and
attempted to be repudiated by Lincoln County because
of the fraudulent or extravagant nature of their incur-
rence. These Lincoln County bonds at the time of their
issuance in 1882 only amounted to $180,000, and in the
year 1900 the interest had accumulated to over $420,000;
that the bonded indebtedness of Lincoln County on these
same bonds was in excess of $600,000; yet the Supreme
Court of the United States set aside the attempted
repudiation of Lincoln County, and held that the stat-
ute of limitations did not run against the holders of the
bonds because of the failure of Lincoln County to keep
paid the accrued interest thereon. These Lincoln County
bonds, or the greater portion of them, were later bought
by the railroad companies running through Lincoln
County for their own protection, and later compromised
at about 50 cents on the dollar with 4 per cent interest,
but the fact remains that there was found to be no legal
way whereby Lincoln County could repudiate their pay-
ment.

The law in question is conceded by all to be constitu-
tional, and it is the legal duty of the executive officer,
designated in the act, to perform the duty enjoined on
him as ordained by the legislative department, and it is
our judicial duty to declare the law, and order its
enforcement. If an executive officer can set aside one
valid law, he can set aside any other valid law and place
himself above the law.

To deny the writ we would have to usurp a power and
right vested solely in the legislative department, and
take a contrary view to the United States Supreme Court
and the Supreme Courts of Nevada and North Carolina

which have passed practically upon every point presented in this case adversely to the respondent.

Under the judgment and power vested in this court by the constitution, the writ must issue in pursuance to the law, but its execution will be temporarily stayed for a period of time to extend until the close of the legislature, which is about to convene, so that an opportunity may be had to consider whether the legislature is desirous of amending the law as above indicated to meet the objections interposed to the acceptance of the proposed bonds or to repeal the act.

If the language remains unchanged, the writ, which will now issue, will become operative; in the interim, for the reasons above assigned, the execution of the writ will be temporarily suspended, and until the further order of this court.

NORCROSS, C. J., dissenting:

I am unable to concur in the conclusions reached by my learned associates in this proceeding. I think the writ should be denied.

Conceding that the act of 1901 is mandatory, and that the governor has no discretion to refuse any gifts, bequests, assignments, etc., metioned in the statute, nevertheless, I think it is clear from the language of the statute that such duty is only imposed where the grant, devise, bequest, donation, gift, or assignment is as to a thing of value. There is no allegation in the petition that the 145 bonds of the State of North Carolina tendered to the governor for the benefit of the State of Nevada are of any value whatever. The respondent has alleged in his answer, as a reason for his refusal, that the said bonds are of no value whatever; that they were fraudulently issued, and have been repudiated by the state issuing the same. These bonds, upon their face, would naturally arouse some suspicion as to whether they were of value. They were all more than ten years past due when offered. The face value of the bonds was $1,000 each, a total of $145,000, upon which unpaid inter-

est coupons were attached amounting to over $256,000. Upon most, if not all of these bonds, no interest has been paid for over forty years. They were all issued in pursuance of acts of the legislature of the State of North Carolina, passed during the years 1868 and 1869. In so far as the State of North Carolina had power to do, it had repudiated these bonds. The answer of the respondent in this case contains the following allegation: "That the said bonds referred to in the petition of relator, and so authorized and issued as aforesaid, were in true legal effect declared invalid and uncollectable by a constitutional amendment adopted by the people of the State of North Carolina in 1880, which said constitutional amendment is in words and figures following, to wit: 'The state shall never assume or pay or authorize the collection of any debt or obligation express or implied, incurred in aid of insurrection or rebellion against the United States or any claim for the loss or emancipation of any slave; nor shall the general assembly assume or pay or authorize the collection of any tax to pay, either directly or indirectly, express or implied, any debt or bond incurred or issued by the authority of the convention of the year 1868, nor any debt or bond incurred or issued by the legislature of the year 1868 either at its special session of the year 1868 or at its regular sessions of the years 1868–1869 and 1869–1870, except the bonds issued to fund the interest on the old debt of the state, unless the proposing to pay the same shall have first been submitted to the people and by them ratified by a vote of a majority of all the qualified voters of the state at a regular election held for that purpose.' "

The bonds in question tendered to the State of Nevada are apparently in a very different situation than the bonds given to the State of South Dakota under the provisions of a similar act to that involved in this action, and which were sued upon by the State of South Dakota in the case of *South Dakota* v. *North Carolina,* 192 U. S. 287, 24 Sup. Ct. 269, 48 L. Ed. 448. The bonds given to the State of South Dakota were never directly repudi-

ated by the State of North Carolina, and were secured by stock of the North Carolina Railroad Company. The judgment in that case went no further than to say that in the event said bonds were not paid by the first Monday of January, 1905, that an order of sale be issued to the marshal of the supreme court directing him to sell at public auction all the interest of the State of North Carolina in and to the said shares of the capital stock of the North Carolina Railroad Company held as security for the payment of said bonds. Any further relief was left for future consideration upon application to the court.

It does not appear that the bonds in question in this proceeding are secured by any mortgage or other collateral security as in the North Dakota case. Even if we are to indulge in the presumption that these bonds were issued in pursuance of law, and were untainted by any fraudulent proceeding, nevertheless a grave question is presented as to the means of enforcing any judgment which might possibly be obtained in the Supreme Court of the United States.

During the progress of the argument in this case one of the counsel for the petitioner stated that he believed these bonds, in their present form, had some market value, and was of the opinion that it was about 25 cents on the dollar of the par value of the bonds. I do not think that this statement should be considered as establishing that the bonds have any value whatever in the face of a failure to make any allegation in the petition that they were of any value and an absolute denial that they were of value made by the answer. It is conceded that in the hands of individuals they are absolutely uncollectible. When the property of the state, the most that can be said is that the state might institute a suit for recovery upon these bonds against the State of North Carolina in the Supreme Court of the United States. In such action the State of North Carolina could, if such were the fact, show that the bonds were never legally issued or were fraudulently issued. If these questions should be resolved in favor of the bonds, there would

then remain the question whether the provision of the constitution of the State of North Carolina was violative of the provisions of the federal constitution, and, if this question was also determined in favor of the State of Nevada as holder of the bonds, there would still be presented the very grave question of enforcing the judgment against the State of North Carolina, should that state not voluntarily make provisions for the payment. In this proceeding, we ought not, in my judgment, to indulge the presumption that the State of North Carolina, without valid and sufficient reason therefor, embodied in its organic law a repudiation of these bonds. For these reasons, I am of the opinion that this court is amply justified in holding that there is a failure upon the part of the petitioner to make any showing that the bonds in question are of any value. The statute of 1901, quoted in the prevailing opinion as before stated, is only intended to apply to some "property or thing of value." It will hardly be contended, I think, that the legislature, in passing the act of 1901, contemplated that the governor should be required to accept bonds of the character involved in this proceeding.

This court, to refuse the writ in this case, would not have to go any further, in my judgment, than it went in the case of *State* v. *Beck*, 25 Nev. 113. In that case this court, by Bonnifield, C. J., said: "Whatever may have been the legislative object in passing the act, we presume it was a good one, but we cannot indulge such violent presumption as that the object was to compel a county to pay a claim which has been finally adjudicated by the courts to be fraudulent on the part of the claimant. '*Mandamus* should not be be granted to compel a technical compliance with the strict letter of the law, in disregard of its spirit.' (*Wiedwald* v. *Dodson*, 95 Cal. 450, 30 Pac. 580; *State* v. *Board Comrs. Phillips Co.*, 26 Kan. 419; High, Extra. Rem., 3d. ed., sec. 9.) The writ is denied."

In the case of *People* v. *Board of Assessors*, 137 N. Y. 201, 33 N. E. 145, the court said: "The writ of *man-*

*damus* is not always demandable as an absolute right, and whether it shall be granted or not frequently rests in the discretion of the court. (*State ex rel.* v. *Comrs. Phillips Co.*, 26 Kan. 419; *People* v. *Hatch*, 33 Ill. 9, 134; *People ex rel. Sherwood* v. *Board of Canvassers*, 129 N. Y. 360, 29 N. E. 345, 14 L. R. A. 646.) The writ will be granted to prevent a failure of justice, but never to promote manifest injustice. It is a remedial process, and may be issued to remedy a wrong, not to promote one, to compel the discharge of a duty which ought to be performed, but not to compel the performance of an act which will work a public and private mischief, or to compel a compliance with the strict letter of the law in disregard of its spirit or in aid of a palpable fraud." See, also, 26 Cyc. 143–155.

Without considering any of the other questions argued in this proceeding, I am of the opinion that the failure to allege in the petition, or otherwise establish, that the bonds offered were of any value is conclusive of this case. The burden was on the petitioner to allege, and, if denied, to establish upon the hearing, that the bonds were of some substantial value. The petition only alleged that certain bonds were tendered to the respondent as acting governor, for the benefit of the state, without any allegation whatever that they were of any value. Upon their face they appeared to be long past due, and as having never been acknowledged as being valid subsequent to their issue by the payment of interest thereon. The refusal of the respondent to receive the bonds in question was based, among other grounds, upon the ground that they were valueless. If the respondent was correct in his conclusions in this regard, he was, in my judgment, acting within the law in refusing to accept the bonds. It was incumbent upon the petitioner in this proceeding to allege and prove that the bonds tendered to the governor for the state were of some material value, and, there being a failure to make such an allegation, the petition did not state facts sufficient to entitle the petitioner to any relief. The mere assertion by coun-

sel for petitioner that in his judgment the bonds did possess some value ought not to be considered in the absence of an agreement or stipulation by the respondent or his counsel that the assertion of petitioner's counsel was a fact to be considered in the case.

From the entire case, and particularly upon the ground of failure to allege or prove value in the bonds tendered, it is my judgment that the writ should be denied.